COYOTE, et al.

v.

Dennis J. ROBERTS, II, et al.

Civ. A. No. 76–0254.

United States District Court,
D. Rhode Island.

Sept. 29, 1981.
Addendum to Supplemental Opinion
Oct. 13, 1981.

Ralph J. Gonnella, Providence, R. I., for plaintiffs.

Gerard McG. DeCelles, Sp. Atty., City of Providence, Providence, R. I., for City defendant.

Eileen G. Cooney, Sp. Asst. Atty. Gen., Providence, R. I., for State defendant.

## SUPPLEMENTAL OPINION

(See 502 F.Supp. 1342 D.R.I. 1980)

PETTINE, Chief Judge.

As stated in the basic opinion at page 1351 the only "remaining question is one of causation. '[P]laintiffs' conduct, as a practical matter, must have played a significant role in achieving the objective . . . . This causation can be the initial catalyst in producing action, or can be the constant prodding that motivates a defendant to go further than it otherwise would have.' *Chicano Police Officers Ass'n v. Stover*, 624 F.2d [127] at 131 [10th Cir. 1980]. The chronological sequence of events is persuasive, although not decisive, circumstantial evidence that the plaintiff's lawsuit was a material factor prompting the defendant's actions. *Morrison v. Ayoob*, 627 F.2d [669] at 672 [3d Cir. 1980]; *Ross v. Horn*, 598 F.2d [1312] at 1322 [3d Cir. 1979]; *Nadeau v. Helgemoe*, 581 F.2d [275] at 281 [1st Cir. 1978]."

\* \* \* \* \* \*

"It [was] obvious to the Court that the subtle workings of causation in this case [could not] be discerned through the media of legal memoranda and affidavits. . . ."

As to the city defendant, this Court also stated in the basic opinion that an evidentiary hearing was necessary to determine whether subsequent changes in city enforcement strategy was in response to this lawsuit or resulted from other legitimate policy reasons. Accordingly, an evidentiary hearing was held.

A summation of the testimony follows. Malcom Brown, the police officer who was

responsible for the enforcement of the prostitution laws from 1975, testified that during 1974, 1975, 1976 and 1977, 204 males were arrested for violating § 11–34–5, *supra*, basic opinion; the testimony is not entirely clear, but as I understand it, prior to 1976, there were few arrests; the 204 arrests resulted from a policy instituted in the summer of 1976 through the use of undercover female police officers posing as prostitutes; prior to 1976, the number of female undercover officers used was negligible. He also testified as to certain raids of clubs which were conducted in 1977 and 1978; in one, 7 females were arrested; in another, 2 males and 7 females; in another, 4 males and 15 females; and in one other, 9 males and 15 females were arrested. More generally, he said that from 1959 through 1975, prosecution for violation of the prostitution statute was primarily focused at females; though males were arrested, they were not prosecuted but rather were used as witnesses to prove the "crime" against the female. From about 1976 and thereafter, the policy changed in that undercover policewomen were used "to apprehend the customers who were soliciting the girls"; in 90% of the cases, the men were charged "just like the girls." Brown stated that citizen complaints started in 1976 concerning men who were picking up prostitutes. In the West End section of Providence, the "problem was of such a magnitude, the cars were bumping into one another—something had to be done"; the police procedures were changed and they started arresting men. "We arrested 500 last year alone, male customers"; however, if no citizen complaints had been made, the police would have continued their past policy to arrest females, with the arrest of males only in "isolated cases."

In 1974, the Providence Police Department employed 9 male undercover officers to effectuate arrests for prostitution; in 1975, the number rose to 28; in 1974 and 1975, no female undercover agents were used to ferret out males for prostitution; in 1976 and 1977, 4 female officers were utilized.

Officer Brown also stated that the West End neighborhood of the City of Providence was "up in arms" about the prostitution problem in their section of the city; they were upset "over male customers harassing everyone trying to pick up girls; they felt nothing was being done." A series of neighborhood meetings were held; at one of them in 1979, which he attended, Chief Judge Henry Laliberte of the State District Court, and several legislators (Patterson, Smith, Dillon and Flynn), were also present. They discussed "cleaning up the problem" which they believed would require amending § 11–34–5; their concern was the number of cases which, under this statute, had been dismissed on constitutional grounds and also the backlog that had developed. Prior to this meeting, Officer Brown claimed he received a copy of an Oregon statute, dealing with prostitution, which "was implemented in New York City at the time they were having all the trouble in Times Square with all the prostitutes"; he claimed that he discussed this statute with Judge Laliberte and other fellow officers. Brown felt it was "great"; as he understood the Oregon law, it made the offense a misdemeanor, provided an appeal only for "trial procedures" rather than the conviction, and permitted visual surveillance for the making of arrests—this he felt would enable the police to "effectively" make more arrests. He took a copy of this statute to the meeting with the West End residents to "have them understand the police were trying to do something"; he stated it was true that at the time of the meeting, he knew the *COYOTE* case was pending and involved the constitutionality of § 11–34–5 and the allegation of selective and discriminatory enforcement of the law by the Providence Police. However, he stated COYOTE had nothing to do with his presence at the meeting; "COYOTE meant nothing to me"—he was present at the meeting because of complaints from the residents; he planned to attempt having the Rhode Island law changed. The thrust of his testimony was that COYOTE played no part in his plans; he thought of having the law changed back in 1977 at which time

he conferred with a City solicitor, who did nothing. As Brown stated, he was looking for something in the law that would give him "some tools" to work with.

Chief Judge Laliberte testified that he received an invitation to attend the West End meeting but was not sure if it was in 1979 or 1980; he recalls it as being during the January 1980 session of the General Assembly. He said he thought Officer Brown, in his statements concerning frustration with the law, was referring to the old Rhode Island statute § 11–45–1 which "had lewd, wanton and lascivious phrase, . . . beggar being about with no . . . means of support—which had been thrown out, first by a Florida Court . . . they declared it was vague and we could see the handwriting on the wall. I think eventually whether our Supreme Court threw it out or not I don't know, but I do know there was some discussion about the Providence Police not then using that lewd, wanton and lascivious to bring their cases against those people charged with soliciting and as a result, they thereafter began charging the soliciting which was the felony charge—I think it was about that time the meeting was held at the church in the West End. . . ."

He did not recall ever discussing the Oregon law with Officer Brown; he first became aware of it at the meeting; one of the councilmen present gave him a copy. Those present suggested an ordinance be passed in the City of Providence; the judge expressed misgivings about doing this because of the existing state statute—this in turn led to a discussion of the charge as a felony under the existing law, which charges, when appealed to the Superior Court, received a low priority; the judge pointed out if the charge was changed to a misdemeanor and appealed to the Superior Court, it would then have an even lower priority. The end result was commissioning the judge to draft a new law providing for trial in the District Court with a direct appeal to the Supreme Court. He did this and delivered it to Representative Smith, who introduced it; a short while thereafter, the General Assembly amended the Rhode Island statute, retaining in part Judge Laliberte's

draft. As to the draft, the Judge stated that he worked from the Oregon statute; he has no recollection if he used the words "for pecuniary gain" but if he did, he had no idea why he did it. He further stated he did not believe the COYOTE publicity prompted his invitation to the meeting. Indeed, though he had heard of the COYOTE suit, he thought it involved police harassment. "The invitation I received was as a result of the neighborhood people having this problem in their immediate area where acts of prostitution were being committed within plain view of passersby and children and where some females were being accosted walking down their own streets—that's as I understand their problem—it was an immediate problem concerning their own area and concerning themselves."

The only other testimony received was by way of an affidavit by Richard Kelaghan, legal counsel to the House Judiciary Committee. It shows that the amendment to § 11–34–5 was introduced by Representative Smith and Senator Patterson, who were present at the West End meeting; it also shows they were prompted by the situation existing in the West End neighborhood. Nothing in the affidavit even indicates that COYOTE played any part in the introduction or passage of this amendment. Mr. Kelaghan further attested that, "The first issue was whether 'johns' should be treated the same as prostitutes and charged with a petty misdemeanor, or be treated the same as 'pimps' and be charged with a felony. The final decision was to have them charged with a petty misdemeanor, and for that reason, the bills were amended by adding the words 'for pecuniary gain' to § 11–34–5 of the General Laws of Rhode Island. By doing this, 'johns' would not be subject to § 11–34–5."

### Burden of Proof

██ I do not find that the plaintiffs' "conduct" played any significant role in the amendment of § 11–34–5. They argue that since the defendants have superior access to the evidence of causation, it is their burden to provide proof that the lawsuit was not a

material factor in bringing about the change; that a litigant does not have the burden of establishing facts peculiarly within the knowledge of the adversary. *Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 538 (D.C. Cir.1975); *reversed on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C.Cir.1973); *Old Ben Coal Corp. v. Interior Bd. of Mine Operations Appeals*, 523 F.2d 25 (7th Cir. 1975). They also argue that the establishment of facts, *i. e.*, the chronological sequence of events, "is sufficient to require the opposing party to produce evidence to rebut the reasonable inferences drawn from the established facts or risk an adverse judgment. *See, e. g., In re Friedman*, 436 F.Supp. 234 (D.Md.1975)." Supplemental Memorandum at 2. Support for this position may be found in *Nadeau v. Helgemoe, supra*, at 281.

> [W]e consider the chronological sequence of events to be an important, although clearly not definitive factor, in determining whether or not defendant can be reasonably inferred to have guided his actions in response to plaintiff's lawsuit. This is particularly true where the evidence relevant to the causes of the defendant's behavior is under defendant's control and not easily available to plaintiff.

And, of course, it is true that the plaintiffs need not prove that the lawsuit was the sole cause of the defendants' action—the question, as I stated *supra*, is whether it played a significant role in achieving the objective.

The actual parameters of the burden of proof are not entirely clear. Plaintiffs, of course, have the initial burden of going forward with the evidence. *Nadeau*, however, indicates that if plaintiffs show a persuasive chronological sequence of events, this may create an inference that the defendant "guided his actions in response to plaintiff's lawsuit." [1] Such an inference would shift to defendant the burden of going forward with the evidence, and require him to show that his actions were not proximately caused by plaintiffs' suit. [2] The court in *Nadeau* noted that this shift in burden was particularly appropriate where, as here, "the evidence relevant to the causes of defendant's behavior is under defendant's control and not easily available to plaintiff." If this were not the case, then the plaintiffs would be confronted with a virtually insuperable barrier. "The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *United States v. N.Y., N.H. & Hartford R.R. Co.*, 355 U.S. 253, 78 S.Ct. 212, 214–15 n.5, 2 L.Ed.2d 247. I find that, while the sequence of events here is sufficiently persuasive to shift to defendant the burden of going forward with the evidence, this burden has been met; the evidence produced at trial proves COYOTE played no part in effectuating the amendment to § 11–34–5.

The only argument the plaintiffs make is that since the West End residents had complained for years about the prostitution problem, why did legislative action occur only after "the torrent of publicity" surrounding this lawsuit? To me the evidence clearly shows that those who were the catalysts (Brown, the legislators and Chief Judge Laliberte) were not that conversant nor concerned with the issues in COYOTE. Indeed, Judge Laliberte thought the case involved police harassment; the residents

---

**1.** This inference need not arise in every case where plaintiff makes an argument based on the chronological sequence of events. Whether such an inference arises depends on the extent to which the sequence of events and other circumstantial evidence is persuasive.

**2.** The risk of non-persuasion remains on the plaintiffs. That is to say that if, after consideration of all the evidence (including evidence of the sequence of events), the trier of fact is not convinced that plaintiffs have proved their case by a preponderance of the evidence, plaintiffs may not prevail. For a discussion of the distinction between the burden of going forward and the risk of non-persuasion, *see* 9 *Wigmore on Evidence* §§ 2485 *et seq.* (3d ed. 1940).

did not even mention COYOTE; Kelaghan's affidavit shows that the legislative discussion was their concern for the neighborhood women and children—"many testified that they no longer allowed their children out of the house at night for fear they would be solicited for prostitution." Affidavit, ¶ 3. I find the defendants have conclusively established that plaintiffs' action had nothing to do with amending the law; the testimony clearly vitiates any inference which might have been drawn from the chronological sequence of events.

The statutory changes have been set forth in the basic opinion. Phrases outlawing the commission of acts of prostitution and other indecent acts were deleted from § 11–34–5. Such deletion mooted the case. I stated at page 1348, "The core of plaintiffs' claim was that the state could not constitutionally bar consenting adults from engaging in purely private sexual activity, irrespective of whether the motivation of one of the participants was economic. As the Court reads the statute, neither the amended version of § 11–34–5 nor the new § 11–34–8 purport to allow such activity." I noted that the Attorney General agreed with this interpretation. Now, in response to the Court's statement, at page 1351 of the basic opinion, that no light had been shed "on why phrases outlawing the *commission* of acts of prostitution and other indecent acts were deleted from § 11–34–5," the plaintiffs juxtapose the amended Rhode Island statute with a "recently enacted New York statute dealing with loitering for prostitution." Plaintiffs claim it is "probable that the Judge was mistaken. Oregon has no similar statute." Neither of these statutes, *i. e.*, either Oregon or New York, were introduced as exhibits and for the purposes of this opinion the Court will accept the plaintiffs' representation as to what they state, because even accepting their argument, I do not find it persuasive. The point they make is that there had to be a conscious deletion of the phrases outlawing the commission of acts of prostitution. For example, they point out:

a) The New York loitering statute itself was a supplementary measure and refers to New York's existing statutory scheme which does prohibit the commission of prostitution. If New York statutory scheme continued to prohibit the act of prostitution, why was the item eliminated from Rhode Island's statutory scheme. Plaintiffs' Supplemental Post-Hearing Memorandum at 4.

\* \* \* \* \* \*

b) Thus the decision to eliminate the commission of prostitution as an offense from Rhode Island's statutory scheme could not have been based upon an unconscious copying of New York's statutory scheme, since New York continued to make the commission of prostitution an offense and refers directly to that fact in the loitering statute.

\* \* \* \* \* \*

c) Moreover, the Rhode Island loitering statute does not parallel the New York statute to such a degree that one could argue that it was simply copied in toto. Rather Rhode Island statute continues to utilize some of its previous terminology interposed with words and phrases from the New York statute.

*Id.* at 5.

True, the *Nadeau* court did say that the chronological sequence of events is important but certainly it did not say it was all inclusive. As I have already stated, the inference the plaintiffs want this Court to draw is, as I see it, totally nullified. The testimony to the contrary is far too convincing:

1. Testimony of Judge Laliberte—drafter of the amendment who, at best, thought COYOTE concerned harassment.

2. The very serious—indeed, in keeping with the evidence may be termed as horrendous—situation existing in the West End.

3. Officer Brown's and the residents' frustrations in having prosecutions expedited; this caused them to conclude that a new law was needed.

4. Mr. Kelaghan's affidavit; he was counsel to the Senate Committee which

debated the amendment; this affidavit clearly shows the concern of the legislators and was centered on the existing conditions.

5. The total lack of any evidence, of any kind, that anyone involved was motivated by or in any way meaningfully aware of COYOTE.

I cannot help but note that none of the legislators, West End residents, or Mr. Kelaghan were called as witnesses by the plaintiffs; of all people, Mr. Kelaghan was present in the courtroom and known by the plaintiffs to be available. I conclude that judgment must be entered for the State defendant.

*City Defendants*

With regard to the defendant City of Providence, the plaintiffs' complaint sought a cessation of the alleged unconstitutional pattern of discriminatory enforcement by the Providence Police Department. As the plaintiffs did not seek damages against the City for this practice but rather injunctive relief, this too became a mooted issue once the plaintiffs determined that the discriminatory practice had stopped. The substantive issue of sexual discrimination ceased to be an issue; accordingly, this Court entered an appropriate order declaring the issue moot on September 22, 1980. *See* n.2 of the basic opinion.

I point out that this Court determined that the plaintiffs had prevailed in a legal sense under 42 U.S.C. § 1988. At pages 1353–1354 of the basic opinion, I stated:

" . . . As prior discussion has emphasized, the Court need not determine whether plaintiffs were likely to have succeeded in this portion of their case. Plaintiffs must only establish that their claim was not frivolous, unreasonable, or groundless. Considering the above evidence, and in light of the Police Department's failure to offer an explanation for its enforcement strategy refuting that advanced by plaintiffs, the Court believes the requisite legal substantiality is present.

It was not unreasonable . . . . It was not frivolous . . . . It is enough for present purposes that plaintiffs' explanation can-

not be dismissed out of hand or obviously without merit."

■■■ Failing to recognize that the second prong of the "prevailing party" test under *Nadeau* was established by plaintiffs and recognized by this Court in its opinion of December 17, 1980; the defendant City argues in its post-hearing brief that plaintiffs have failed to "put forth the heavy burden of proof as required in a claim of discriminatory enforcement." Defendant's brief at 2. In a 42 U.S.C. § 1988 claim for attorneys' fees, the plaintiffs have no such "heavy burden of proof" nor must they establish the actual claim of discriminatory enforcement. *Nadeau, supra; Maher v. Gagne*, 448 U.S. 122, 132, 100 S.Ct. 2570, 2576, 65 L.Ed.2d 653 (1980). Here, as in the case against the State defendant, the only remaining inquiry is whether the institution of the plaintiffs' suit in fact caused or significantly contributed to the Providence Police Department's change of policy in enforcing R.I.G.L. § 11–34–5? I find that it did.

To begin with, the plaintiffs need not establish that their lawsuit was the only reason for the Police Department's change in enforcement policy. The reasons for change are, as this Court sees it, within the control of the defendants. There were no written orders issued by the Police Department, as of the date of the change, which details facts and reasons for such change. One thing is sure; the then Chief of the Police Department was a named defendant and it is reasonable to assume he was well aware of the charge of discriminatory enforcement placed against him. Unfortunately, the Chief is now deceased and thus direct inquiry has been cut off; but there is no question that right after he was sued, the change in policy was instituted and he was the one responsible for such change. The West End residents had complained for years; in spite of this, the policy carried on "as usual." I find it rather strange that the only witness, Detective Brown, who was in charge of the enforcement of prostitution laws and who could have addressed the reasons behind the order, stated he did not

discuss the reasons for the change with the Chief.

The point is that these factors, when combined with this Court's finding that plaintiffs' claim was substantial under prevailing *legal* theory, do create the reasonable inference that plaintiffs' lawsuit at least helped provoke the Departmental policy change. *Nadeau, supra,* at 281. While the defendant City has argued that the policy change stemmed from changing patterns of prostitution in the city, an accumulation of public complaints, and a desire to more effectively enforce the law, it has not produced any evidence whatsoever to rebut the reasonable inference that plaintiffs' suit was at least partly responsible for provoking the Department's change in enforcement policy. The evidence shows the West End residents had been complaining "for years" and yet the defendant did not offer any testimony from these residents that, indeed, patterns had changed; that is, that the male element had become an increasing problem. The State, in its § 1988 argument, successfully rebutted an inference that this lawsuit was a significant factor in prompting the statutory change by presenting lengthy evidence on the origination of the movement to amend the statute. In its facet of the hearing, in contrast, the City presented no comparable evidence to rebut the inference of causation on the § 1988 question. In short, I find that the plaintiffs successfully established the inference that their lawsuit played a substantial role in prompting the change and the City failed to rebut this inference. Plaintiffs have therefore satisfied their burden of persuasion on this issue.

This being the case, based upon the available unrebutted evidence, the factual conclusion must be drawn that the plaintiffs' lawsuit was a significant factor in at least helping to provoke the change in the enforcement policy of the Providence Police Department. This satisfies the causation-in-fact prong of *Nadeau's* "prevailing par-

**3.** The Court is referring to the Chief of Police in his official capacity; therefore, the judgment is to be paid out of appropriate City funds. *See*

ty" test as to the defendant City under 42 U.S.C. § 1988. *Nadeau, supra.*

I conclude that the plaintiffs should be awarded reasonable attorneys' fees from the City[3] unless special circumstances would render such an award unjust. S.Rep.No. 94–1011, reprinted in [1976] U.S. Code Cong. & Admin.News, pp. 5908, 5912. *Cf. Williams v. Miller,* 620 F.2d 199 (8th Cir. 1980). Defendant City has failed to demonstrate any special circumstances that would justify the withholding of reasonable attorneys' fees in this case.

An appropriate order will be prepared by the plaintiffs in keeping with this Supplemental Opinion.

*Hutto v. Finney,* 437 U.S. 678, 699–700, 98 S.Ct. 2565, 2578–79, 57 L.Ed.2d 522 (1978).