**S.D., et al., Plaintiffs,**

**v.**

**Gordon FAULKNER, et al., Defendants.**

**No. IP 84–1178–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 13, 1989.

Kenneth J. Falk, Kathryn Williams, Legal Services Organization of Indiana, Inc., Indianapolis, Ind., for plaintiffs.

David Steiner, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

ENTRY

TINDER, District Judge.

This cause comes before the court on Motion to Award Plaintiffs Costs and Reasonable Attorneys' Fees pursuant to 42 U.S.C. § 1988 (1982). Plaintiffs, residents at the Indiana Girls' School, filed a declaratory action under 42 U.S.C. § 1983 (1982) against the Commissioner of the Indiana Department of Correction and the Superintendent of the Indiana Girls' School. This court had jurisdiction pursuant to 28 U.S.C. § 1343 (1982). Plaintiffs, however, voluntarily dismissed this section 1983 action pursuant to Fed.R.Civ.P. 41(a)(2) and then moved this court for an award of attorneys' fees. After reviewing the law, as

well as the memoranda, depositions and other materials, this court GRANTS plaintiffs' motion to award costs and attorneys' fees, with modifications, based upon the following findings and reasons.

## I. BACKGROUND

This case arises from plaintiffs' concerns about the treatment program, as it existed in 1984, at the Indiana Girls' School. The School is an institution created to rehabilitate adolescent girls between the ages of twelve and eighteen whose behavior has resulted in institutional commitment for delinquency. The treatment program, known as Positive Peer Culture or P.P.C., began at the Indiana Girls' School in 1981. Harry Vorrath, a consultant for the Indiana Department of Correction who worked with the Indiana Girls' School until June 1984, was in charge of implementing P.P.C. The program was designed, according to the defendants, to work with anti-social and conduct-disordered adolescents by focusing on group interaction and developing positive peer leadership skills in problem identification and resolution.

After a girl entering the Indiana Girls' School underwent a physical examination, psychological tests, and a social history evaluation, an assignment committee determined whether she should be placed in the P.P.C. program. If so, then she was assigned, based upon such factors as age and maturity level, to one of several P.P.C. groups consisting of approximately eight to ten girls and an adult group leader. This group then lived together in a cottage and participated in many activities together, including school and regular meetings. There were twelve P.P.C. groups in 1984, which accounted for roughly eighty percent of the residents at the Indiana Girls' School, according to the Superintendent of the School, Thomas D. Hanlon. A staff team, consisting of the adult group leaders and other persons having regular contact with the girls, met in weekly meetings to review the girls' progress and to plan future strategies. Minutes of these meetings were sent to Superintendent Hanlon.

Plaintiffs, who are referred to only by their initials, were minor female residents at the Indiana Girls' School and participants in the P.P.C. program in 1984.

On May 1, 1984, counsel from Legal Services Organization of Indiana, Inc., on behalf of plaintiffs, wrote a letter to the Commissioner of the Indiana Department of Correction, Gordon Faulkner, outlining concerns regarding the practices and programs at the Indiana Girls' School. Specifically, plaintiffs alleged that physical discipline and beatings were being imposed, that P.P.C. had supplanted virtually every other treatment program, that P.P.C. was inadequate for many girls, and that the P.P.C. groups were allowed to veto a girl's parole. Commissioner Faulkner responded by letter and invited plaintiffs' counsel to a meeting at the Indiana Girls' School to which plaintiffs' counsel did attend. Between May 21, 1984, and July 18, 1984, it appears that subsequent discussions and correspondence followed but that the P.P.C. program was not changed. Thus, plaintiffs filed a lawsuit pursuant to 42 U.S.C. § 1983 (1982) against Commissioner Faulkner and Superintendent Hanlon, in their official capacities, on August 9, 1984, alleging that conditions at the Indiana Girls' School violated plaintiffs' constitutional rights.

On December 21, 1987, plaintiffs filed a motion to dismiss their action, stating that the substantive issues in the case had been resolved to plaintiffs' satisfaction due to changes that had taken place at the Indiana Girls' School after the filing of the lawsuit. This court granted plaintiffs' motion to dismiss, and plaintiffs then filed a motion to have attorneys' fees awarded to them under 42 U.S.C. § 1988 (1982), contending that they were so entitled because their lawsuit had been the catalyst for changes at the Indiana Girls' School—changes that resolved many of the issues in this dismissed section 1983 lawsuit. The defendants opposed the motion by arguing that any changes of the treatment program at the Indiana Girls' School were the result of the departure of the P.P.C. consultant, the effects of the implementation of the new

state juvenile code, and "coincidence," not the result of plaintiffs' lawsuit.

## II. RECOVERY OF ATTORNEYS' FEES IN LITIGATION UNDER 42 U.S.C. § 1983 (1982)

The Civil Rights Attorney's Fees Awards Act of 1976, codified as an amendment to 42 U.S.C. § 1988 (1982) provides as follows:

In any action or proceeding to enforce a provision of [42 U.S.C. §§] 1981, 1982, 1983, 1985, and 1986 ..., title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, *may allow the prevailing party*, other than the United States, a reasonable attorney's fee as part of the costs. [emphasis added]

The legislative history of section 1988 discloses that the purposes of the Civil Rights Attorney's Fees Awards Act of 1976 is to encourage filing of civil rights suits. S.Rep. No. 1011, 94th Cong., 2d Sess. (1976) (to accompany S.2278), *reprinted in*, 1976 U.S.Code Cong. & Admin. News 5908–14; *see also Price v. Pelka*, 690 F.2d 98, 101 (6th Cir.1982).

### A. *Standard for Awarding Fees to Prevailing Plaintiffs*

Plaintiffs are considered "prevailing" if only partially successful, so long as they achieve success on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978) (cited with approval in *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). This requires two determinations. Firstly, the court must ascertain whether plaintiffs have demonstrated that their lawsuit was causally related to securing the relief obtained. Secondly, "[i]f it has been judicially determined that defendants' conduct, however beneficial it may be to plaintiffs' interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense." *Nadeau*, 581 F.2d at 281; *see also Clay v. Harris*, 583 F.Supp. 1314 (N.D.Ind.1984). Plaintiffs may "prevail"

even when the benefit sought is achieved through defendants' voluntary compliance if the "suit was the 'catalyst' that brought about compliance by the defendants ... [and] judicial relief may no longer be necessary." *Williams v. Miller*, 620 F.2d 199, 202 (8th Cir.1980) (per curiam) (plaintiffs could be prevailing parties even though they moved to dismiss suit without prejudice; relief sought was in substance obtained by defendants' voluntary compliance after suit was filed and suit may have been the "catalyst" that brought compliance about); *Ramos v. Koebig*, 638 F.2d 838 (5th Cir.1981). Furthermore, a party need not prevail on every issue to be awarded attorneys' fees under section 1988. *Larsen v. Sielaff*, 702 F.2d 116, 117 (7th Cir.1983), *cert. denied*, 464 U.S. 956, 104 S.Ct. 372, 78 L.Ed.2d 330 (1983); *Busche v. Burkee*, 649 F.2d 509, 521 (7th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Dawson v. Pastrick*, 600 F.2d 70, 78–79 (7th Cir.1979).

The Seventh Circuit set out the following standard in *Illinois Welfare Rights Organization v. Miller*, 723 F.2d 564, 566 (7th Cir.1983) for determining whether plaintiffs are "prevailing parties":

To be considered a "prevailing party," a plaintiff need not have succeeded at a trial on the merits, so long as through settlement or otherwise the plaintiff has vindicated his or her rights. *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Harrington v. DeVito*, 656 F.2d 264 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982). The test for whether a plaintiff is a prevailing party in a settled case is two-fold. First, "the plaintiff['s] lawsuit must be causally linked to the achievement of the relief obtained," and second, "the defendant must not have acted wholly gratuitously, *i.e.*, the plaintiff['s] claim[ ], if pressed, cannot have been frivolous, unreasonable, or groundless." *Harrington v. DeVito*, 656 F.2d at 266–67.

Thus, even though a case is voluntarily dismissed by plaintiffs, attorneys' fees can be awarded if the plaintiffs' lawsuit was

the catalyst for changes sought by plaintiffs. *See, e.g., Fields v. City of Tarpon Springs, Florida,* 721 F.2d 318 (11th Cir. 1983) (black plaintiffs' suit was a catalyst in bringing about changes in defendant's park and recreational services); *Morrison v. Ayoob,* 627 F.2d 669 (3rd Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *Dawson,* 600 F.2d at 79 (plaintiffs in section 1981 fair employment practices litigation leading to consent decree were prevailing parties where lawsuit "operated as a catalyst prompting the defendants to institute fair employment practices"); *cf. DeMier v. Gondles,* 676 F.2d 92 (4th Cir.1982) (while not applying the catalyst test, the court recognized that a voluntary dismissal does not preclude a finding that the party prevailed).

### B. *Did plaintiffs prevail?*

 Firstly, this court must determine whether plaintiffs' section 1983 lawsuit was causally linked to the changes in the P.P.C. program. The court's analysis of this causal link often relies heavily on the chronology of events. *Cf. Lovell v. City of Kankakee,* 783 F.2d 95 (7th Cir.1986) (court reviewed the chronology of events in reversing and remanding the district court's denial of attorney's fees); *Braafladt v. Bd. of Governors,* 778 F.2d 1442, 1444 (9th Cir.1985) (chronology is important but not definitive; no causal connection shown); *Williamson v. Secretary of U.S. Dept. of HUD,* 553 F.Supp. 542, 545 (E.D.N.Y.1982) (chronology is important; showed that challenged regulations were changed at a time when plaintiff's suit was going badly and was thus not causally related); *Coyote v. Roberts,* 523 F.Supp. 352 (D.R.I.1981) (chronology is important, but not definitive; suit did not play "any significant role" in obtaining amendment of state prostitution statute, but helped provoke change in discriminatory enforcement by city police). *Compare Robison v. Kimbrough,* 620 F.2d 468, 477 (5th Cir.1980), *vacated,* 652 F.2d 458 (5th Cir.1981) ("The chronological sequence of events in this case and the substantive changes in the composition of the jury lists after plaintiffs filed their jury discrimination action establish that defendants 'voluntarily' revised the lists in response to plaintiffs' lawsuit."); *Mendoza v. Blum,* 560 F.Supp. 284, 287 (S.D.N.Y.1983) (looking at procedural chronology in concluding that relief was "obtained because of the lawsuit"); *Jaeger v. City of Farmington, Minnesota,* 528 F.Supp. 684, 686 (D.Minn.1981) ("It is evident from analyzing the undisputed chronology of events that the plaintiffs' suit was a 'necessary and important factor' in the repeal of the ordinance.") *with Am. Constitutional Party v. Munro,* 650 F.2d 184 (9th Cir.1981) (chronology showed that change in law was in the works for years before suit filed). Plaintiffs' amended complaint contained many allegations that are summarized as follows:

1. Under the P.P.C. program, group members were supposed to physically restrain another group member until she "cools off" if at any time she was physically combative or threatening.

2. Residents are sent to the disciplinary cottage without inadequate procedures and for inadequate reasons.

3. In order to see a mental health professional, a resident must request their P.P.C. group's permission, and if a majority of the group refuses, the resident may be refused permission by the staff.

4. No alternative treatment programs existed; P.P.C. was used even if it was not an appropriate treatment for a particular individual.

5. P.P.C. groups had to be together at all times.

6. The Indiana Girls' School did not provide adequate drug and alcohol treatment.

7. The residents voted on a group member's release, thereby allowing a P.P.C. group to deny the release of a member.

8. Residents were subject to punishment for speaking against the P.P.C. program.

After the lawsuit was filed and plaintiffs began discovery, the Indiana Girls' School significantly changed the first five of these areas. Plaintiffs concede that the amount of alcohol and drug counseling and the system for releasing the residents have not

been changed substantially. They did not present any evidence to determine if residents were and still are punished for criticizing the P.P.C. program; however, defendants deny this allegation. Thus, this court finds that the last three areas listed above of which plaintiffs complained were not changed as a result of the filing of plaintiffs' lawsuit.

It appears that the Indiana Girls' School did address the first five areas of concern listed above through changes in policies and procedures. Defendants argue that these changes were the result of the natural maturation of the treatment program, as well as other factors, none of which had anything to do with plaintiffs' lawsuit. The timing, however, is suspect. Based upon Superintendent Hanlon's deposition, as well as the depositions of other staff members and the minutes of various team meetings, the chronology of events strongly indicates that the changes were prompted by plaintiffs.

The P.P.C. program commenced in July 1981 and was ongoing when plaintiffs' lawsuit was filed over three years later—August 9, 1984. Mr. Vorrath, the founder of P.P.C. and the consultant to the Department of Correction, advocated that girls physically restrain fellow group members if the group deemed it necessary. Team minutes kept prior to the filing of plaintiffs' lawsuit disclose several examples of girls restraining each other in an attempt to control behavior. For example, the minutes of the meeting held on March 17, 1983, indicate that concern was expressed that a group did not know how to restrain. The minutes of the meeting held on May 22, 1984, indicate that at least one group member restrained another during a physical altercation. The minutes of the meeting held on August 2, 1984, indicate that a team member "expressed concern because the group did not try to restrain [a group member] even though [she] was hitting group members." According to the deposition of the medical doctor for the Indiana Girls' School, Dr. Larry Lovall, "a lot" of injuries were inflicted during peer restraining. When peer restraint was occurring, Dr. Lovall, who was also employed by the

Indiana Boys' School, stated that he thought there were approximately four times the number of injuries at the Indiana Girls' School as compared to the Indiana Boys' School, even though the latter had four times the number of residents.

Superintendent Hanlon testified that on about July 1, 1984, immediately prior to the filing of the lawsuit and after Mr. Vorrath's departure, he gave verbal orders to stop the policy of peer restraint. According to Mr. Hanlon, he did not issue a written order. Any verbal orders to modify the P.P.C. program, however, were not reflected in the minutes of the meetings during that time despite Mr. Hanlon's belief that his orders to modify the program should be reflected in the minutes. The first indication of any modification in the program was reflected in the minutes of the meeting held on August 14, 1984, five days after the plaintiffs' lawsuit was filed, which noted changes in the P.P.C. group process as follows:

11. If a student is not a new group member and not a run risk, it is not necessary to escort them. If escort is necessary, a group of three should go. Team to use their own discretion. Psychiatric referrals are not to go through recommendations. The group are not to question a student on this. It is confidential. No student should restrain another student. Staff should restrain the student if necessary.

12. Arrangements are being made to allow groups more personal time.

Similarly, the policies and procedures used regarding the disciplinary cottage were changed subsequent to the filing of the lawsuit. For example, prior to the litigation, there were no written policies concerning placement of girls in the disciplinary cottage and no procedures for a hearing. Subsequent to the litigation, incident report forms and segregation forms were utilized for the first time, and hearings before a hearing officer were conducted within twenty-four hours of detention to determine if continued detention was necessary. In addition, policies were modified so that girls were no longer routinely placed

in cells as opposed to regular rooms, and girls were no longer kept in the disciplinary cottage for weeks at a time without a formal written review.

According to the deposition of Dr. Constance Clodfelter, a psychologist at the Indiana Girls' School, she did not believe that the P.P.C. program was appropriate for all residents. Dr. Gary Bartell, also a staff psychiatrist, stated in his deposition that based on his evaluation of plaintiff S.D., he would have recommended that she be placed into a non-P.P.C. cottage if one had been available at that time. Plaintiffs charged that this lack of alternative methods of treatment violated their right to individual treatment. Alternative treatment was made available, but not until after plaintiffs' litigation commenced. This change was reflected in the minutes of the meetings on August 28, and 29, 1984, which indicate that Superintendent Hanlon was forming a new, modified P.P.C. group in cottage 7.

Based upon the deposition testimony and exhibits, particularly the team meeting minutes, this court finds that defendants made significant changes after plaintiffs' lawsuit was filed. There is little, if any, evidence to support defendants' assertions that verbal orders to modify these various procedures were given prior to the litigation. Furthermore, it seems difficult to believe that a state-controlled school, which is part of the Department of Correction bureaucracy, would routinely make policy changes by word of mouth, rather than by written orders. It is also difficult to understand why defendants would wait to change the P.P.C. program until after the P.P.C. consultant left. For example, if defendants truly disagreed with the peer restraint because of the potential physical harm to the girls or the ineffectiveness of the practice, then it seems apparent that the best thing for the girls would have been the immediate cessation of the practice, not for the school to wait three years for the consultant's contract to expire. Thus, this court further finds that plaintiffs' lawsuit was the catalyst for the following changes: the cessation of peer restraint; the modification of procedures for

girls sent to the disciplinary cottage; the cessation of peer/staff approval for psychological treatment; the modification of a P.P.C. group for those who did not fit into the standard program; and the relaxation of the rules that required group members to be together at all times. Defendants cite *Perlman v. City of Chicago*, 801 F.2d 262 (7th Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987), as support that plaintiffs have not proved that the lawsuit actually caused the result sought. *Perlman* is clearly distinguishable from this case, e.g., the Seventh Circuit held that plaintiff's legal claims lacked merit and noted that plaintiff had never requested the return of his property from the police department before filing suit for its return.

■ Even though plaintiffs' lawsuit was the catalyst for changes at the Indiana Girls' School, I must determine whether the changes made by defendants were gratuitous, i.e., whether plaintiffs' claims were "frivolous, unreasonable or groundless." *Harrington*, 656 F.2d at 266–67. The Seventh Circuit has held that juveniles adjudged delinquent have a constitutional right to individualized treatment. *Nelson v. Heyne*, 491 F.2d 352 (7th Cir.1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Furthermore, the eighth amendment prohibits punishments that are without penological justification. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Harrington*, 656 F.2d 264. There is also case law support for the position that punitive confinement of residents for verbal hurting behavior and their placement in detention for long periods of time without any procedural protections violated plaintiffs' constitutional rights. *See Morgan v. Sproat*, 432 F.Supp. 1130 (S.D.Miss.1977). Thus, this court finds that plaintiffs' claims were not frivolous, unreasonable or groundless, and that the changes at the Indiana Girls' School were not gratuitous. Accordingly, this court finds that even though plaintiffs voluntarily dismissed their section 1983 action against defendants, they were prevail-

ing parties within the meaning of section 1988.

## C. *Amount of the award.*

In civil rights actions, a party seeking to enforce section 1983 should, if successful, "ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." S.Rep. No. 94–1011, 94th Cong., 2d Sess. 4 (1976), 1976 U.S.Code Cong. & Admin.News 5912 (quoting *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)); *see also Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937 (1983). The burden of demonstrating the existence of special circumstances is on the defendant. *See, e.g., Gautreaux v. Chicago Housing Auth.,* 690 F.2d 601, 611 (7th Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *Crosby v. Bowling,* 683 F.2d 1068, 1072 (7th Cir.1982); *Clay,* 583 F.Supp. at 1317. It is not relevant that the defendants are state officials so that fees will ultimately fall on taxpayers. *See, e.g., Ackerley Communications, Inc. v. Salem,* 752 F.2d 1394, 1398 (9th Cir.1985), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985); *Ramos v. Lamm,* 713 F.2d 546, 552 (10th Cir.1983); *Gary B. v. Cronin,* 542 F.Supp. 102, 121 (N.D.Ill.1982) (on motion for attorneys' fees). In this action, defendants argue that plaintiffs were not "prevailing," and thus, should not be awarded attorneys' fees pursuant to section 1988. Defendants do not argue, however, that if plaintiffs are found to be a prevailing party, then special circumstances exist that render an award of fees unjust. Indeed, based upon the evidence before this court, there does not appear to be any such special circumstances. Therefore, this court must look to the United States Supreme Court's guidelines set out in *Hensley* and to subsequent Seventh Circuit precedent for calculating the proper amount of an attorneys' fee award in cases where plaintiffs only partially prevail on their claims.

The initial step in determining a section 1988 award of attorneys' fees is to multiply the number of hours reasonably expended by a reasonable hourly rate. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. This figure, which is often referred to as the "lodestar" amount, may then be modified upward or downward based upon the following considerations:

1. the time and labor required;
2. the novelty and difficulty of the questions;
3. the skill requisite to perform the legal service properly;
4. the preclusion of employment by the attorney due to acceptance of this case;
5. the customary fee;
6. whether the fee is fixed or contingent;
7. time limitations imposed by the client or the circumstances;
8. the amount involved and the results obtained;
9. the experience, reputation, and ability of the attorneys;
10. the "undesirability" of the case;
11. the nature and length of the professional relationship with the client; and
12. awards in similar cases.

*Hensley,* 461 U.S. at 429–30 n. 3, 103 S.Ct. at 1937–38 n. 3 (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)); *see also Lynch v. City of Milwaukee,* 747 F.2d 423 (7th Cir.1984) (Seventh Circuit adopts the list cited in *Hensley,* expanding its list from eight to twelve factors). Plaintiffs in this action did not request an upward adjustment.

When plaintiffs only partially prevail on their claims, however, the calculation of fees becomes more difficult. In *Hensley,* the Supreme Court set out the following guidelines:

We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not

have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Hensley*, 461 U.S. at 440–41, 103 S.Ct. at 1943–44.

The Court rejected any mechanical apportionment of fees based on the success or failure of particular issues. *Cf. Illinois Welfare Rights Org.*, 723 F.2d at 566–67 (Seventh Circuit acknowledges that *Hensley* implicitly rejected court's previous position that fees should be awarded only for those specific claims on which the plaintiff prevailed). The Supreme Court further emphasized the importance of an attorney's time records, as well as the need for the district court to make clear that it is has considered the relationship between the results obtained, i.e., the extent of plaintiffs' success, and the fee awarded.

■ With respect to the *Hensley* requirement that a distinction must be drawn between time spent on unsuccessful unrelated claims and unsuccessful related claims, the Seventh Circuit stated that "an unsuccessful claim will be unrelated to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1279 (7th Cir.1984). Thus, if a partially prevailing party has asserted any unsuccessful claims that are distinctly different from the successful claims, i.e., claims based on different facts and legal theories, then these claims should be excluded in determining reasonable attorneys' fees. *See Spanish Action Comm. of Chicago v. City of Chicago*, 811 F.2d 1129 (7th Cir.1987); *Illinois Welfare Rights Org.*, 723 F.2d 564 (7th Cir.1983) (court applied *Hensley* in a combined summary judgment and settlement case). Plaintiffs claimed that residents were subject to punishment for speaking against the P.P.C. program, which was a

denial of their right to free expression granted by the first amendment to the United States Constitution as applied to the State of Indiana through the fourteenth amendment. This unsuccessful claim was distinctly different from the successful claims because it was based on a different legal theory than any of the other claims. Thus, this court finds that plaintiffs' claim based upon a first amendment violation is unrelated, and the time spent on this claim is not compensable. *See Jackson v. Illinois Prisoner Review Bd.*, 856 F.2d 890 (7th Cir.1988).

■ Plaintiffs' other two unsuccessful claims fall within *Hensley's* second category of cases in which a partially prevailing party's claims for relief involve a common core of facts or are based on related legal theories. *See Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. These unsuccessful claims— that the Indiana Girls' School did not provide adequate drug and alcohol treatment and that the residents voted on a group member's release, thereby allowing a P.P.C. group to deny the release of a member—were based on the legal theory that these actions denied plaintiffs' right to treatment as guaranteed by the due process clause of the fourteenth amendment. Several of the successful claims also relied on this legal theory. Thus, this court finds that these two unsuccessful claims were related to the successful claims because they were based on a common core of conduct, policies and procedures and related legal theories.

■ The time spent on related, but ultimately unsuccessful, claims should not be automatically excluded from the fee calculation. *Spanish Action Comm. of Chicago*, 811 F.2d at 1133. Instead, the court must focus on "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. A fee award should not be reduced simply because the prevailing party failed to prevail on every contention. *Lenard v. Argento*, 808 F.2d 1242 (7th Cir.1987). In this action, plaintiffs' lawsuit served as a catalyst in the changing of five

of the eight areas of which plaintiffs complained. This is certainly significant; however, it is not an "excellent result." *See Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940.

Due to plaintiffs' lack of success on the two related claims, this court feels that awarding attorneys' fees for all hours expended would be excessive. While I would prefer to identify specific hours that should be eliminated, the attorneys' time sheets understandably do not identify the specific claims being pursued at any given time. Thus, I will reduce the overall award to account for the limited success. *See id.* at 436–37, 103 S.Ct. at 1941–42.

■] The United States Supreme Court has held that Congress clearly intended that prevailing parties be awarded attorney's fees calculated by the use of prevailing market rates, regardless of whether such parties were represented by nonprofit legal service organizations or private attorneys. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In this action, plaintiffs' attorneys have submitted time sheets reflecting that a total of 154.7 hours were expended. The attorneys request that 109.8 of these hours be charged at $125.00 per hour and that the remaining 44.9 hours, which were incurred by a less experienced attorney, be charged at $90.00. These rates are supported by affidavits to be within the range of the prevailing market rates, and this court so finds the rates to be acceptable. However, this court finds that the hours incurred to be excessive in light of the partial success in this action. I will exclude from the fee calculation time spent on the unsuccessful, unrelated first amendment claim, and I will then reduce the remaining award based upon the two unsuccessful, related claims. Thus, the final award reflects the plaintiffs' limited success. Accordingly, this court reduces the award of attorneys' fees approximately thirty-seven percent from the original lodestar amount of $17,766.00 to $11,100.00. *Cf. Jackson,* 856 F.2d at 895 (court rounded award to the nearest hundred dollars to avoid creating the impression of exactness).

## III. CONCLUSION

Based upon the aforementioned reasons, this court finds that plaintiffs are partially prevailing parties in their section 1983 lawsuit against defendants, and thus, are entitled to an award of attorneys' fees. Accordingly, this court holds that defendants must pay plaintiffs' attorneys' fees in the amount of $11,100.00.