[No. E035881. Fourth Dist., Div. Two. Sept. 19, 2006.]

BORDER BUSINESS PARK, INC., Plaintiff and Appellant, v. CITY OF SAN DIEGO, Defendant and Appellant.

1540

**COUNSEL**

McKenna Long & Aldridge, Niddrie, Fish & Buchanan, Michael H. Fish; Niddrie & Hegemier, David A. Niddrie; Thorsnes, Bartolotta & McGuire, Vincent J. Bartolotta, Jr.; Wasserman, Comden, Casselman & Pearson, David B. Casselman; and Geoffrey C. Hazard, Jr., for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy, Lisa Perrochet, Curt Cutting; Latham & Watkins, Michael J. Weaver and Jared G. Flinn for Defendant and Appellant.

OPINION

**McKINSTER, Acting P. J.—**

## INTRODUCTION

The City of San Diego (the city) appeals a judgment for inverse condemnation awarding $65.3 million in damages to Border Business Park, Inc. (hereafter sometimes referred to as Border).[2]

Border is a real estate development company which was developing a business park in Otay Mesa. Otay Mesa was then an unincorporated area in San Diego County adjacent to the Mexican border, and was later annexed by the city. Border asserted two causes of action for inverse condemnation. The first arose from the city's actions in connection with its announcements of a plan to create an international airport in Otay Mesa. Border contended that these announcements substantially interfered with sales of property within the business park and diminished the value of the property. The second inverse condemnation cause of action arose from the city's diversion of truck traffic, engendered by a newly opened crossing at the Mexican border, in a manner which allegedly interfered substantially with access to the business park.

The city asserts numerous grounds for reversal of the inverse condemnation judgment. Because we agree with the city's contention that the evidence was insufficient as a matter of law to support a finding of inverse condemnation on both theories, we address only that issue.

Border cross-appeals from an order granting the city's motion for a new trial on Border's cause of action for breach of the development agreement it

---

[2] Judge Di Figlia presided over the trial of this case but recused himself after the jury returned its verdict. Raymond J. Ikola, Judge of the Orange County Superior Court, was assigned by the Chief Justice, pursuant to article VI, section 6 of the California Constitution, to hear posttrial motions. On appeal, defendant City of San Diego challenges the sufficiency of the evidence to support the judgment. In its cross-appeal, plaintiff Border Business Park, Inc., challenges the partial grant of the city's motion for new trial on a cause of action for breach of contract.

entered into with the city. It contends that the trial court erroneously found that damages which accrued before a certain date were time-barred. We affirm the order granting the city's motion for new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Border Business Park, Inc., is one of numerous business entities owned by the De La Fuente family. The family business was founded by Roque De La Fuente, Sr., and his wife, Bertha Guerra De La Fuente, but is now controlled by their son, Roque De La Fuente II.[3] The trial court found that Mr. De La Fuente and the other De La Fuente family entities "are the alter ego of plaintiff Border Business Park, and of each other."

In 1983, the De La Fuentes purchased 312 acres of land in Otay Mesa, an unincorporated area in San Diego County adjacent to the Mexican border. Two hundred sixty acres of the parcel they purchased were usable for development. The purchase was made through Border Business Park, Inc. Bertha Guerra De La Fuente was the sole shareholder, director, president and CEO of the corporation. Mr. De La Fuente managed the company through a corporation he owned, American International Enterprises.

In the early 1980's, the city became interested in annexing Otay Mesa. The area was then primarily raw land, but it included a small general aviation airport called Brown Field. In anticipation of annexation, the city created a community plan for Otay Mesa in 1981. The plan stated that a study by the San Diego Association of Governments (SANDAG), an association of local area governments, had identified Otay Mesa and Miramar Naval Air Station as "favored alternatives" for relocating San Diego's international airport, Lindbergh Field. The report recommended Otay Mesa as the "most likely" site for the new airport. In 1985, the city annexed Otay Mesa.

In 1986, the city entered into a development agreement with Border. The agreement provided that Border would pay certain fees and would bear the cost of various public improvements incident to the development of the business park. In return, the city agreed not to apply later-enacted rules or regulations to Border if they conflicted with laws in effect on the date of the agreement. The city also agreed not to hold Border responsible for revisions in certain types of fees or development standards, except under specified conditions.[4] To finance the development, the city provided Border with funds

---

[3] References to "Mr. De La Fuente" are to Roque De La Fuente II.

[4] Because we affirm the order granting the city's motion for new trial on Border's cause of action for breach of the development agreement, we need not discuss the agreement or the alleged breaches.

from municipal bonds, requiring Border to repay the bonds through periodic assessments over 20 years.

In 1988, SANDAG revisited the idea of locating an airport in Otay Mesa, which was still largely undeveloped. To preserve the status quo during the continued study, the city issued a one-year moratorium on certain types of development in Otay Mesa. The moratorium exempted portions of Otay Mesa for which the city had already issued development permits, including the property owned by Border. Subsequent moratoria were limited to residential development.

In 1989, SANDAG issued an updated report identifying Miramar and Otay Mesa as potential sites for a new airport. The city decided that Otay Mesa was a more viable site than Miramar. It also concluded that the Otay Mesa site would probably require the use of Mexican airspace. In 1991, the city passed a resolution stating that an international airport in Otay Mesa was the preferred option for a new airport. It designated it the "TwinPort" plan, referring to the creation of an international airport spanning the border, using the existing Brown Field in Otay Mesa and Rodriguez Field in Tijuana. However, the city did not inquire of the appropriate officials in Mexico to determine whether Mexico had an interest in such a plan, or whether Mexico would allow the use of its airspace for an airport built solely on the American side of the border. Two years later, the city was forced to abandon the Otay Mesa airport idea, upon belatedly discovering that Mexico was not interested in the plan and would not cooperate.

During the time that the city was pursuing the Otay Mesa airport plan, sales within Border Business Park fell off precipitously. Public announcements of the airport proposal, some of which showed possible configurations of the airport which would place runways directly through Border Business Park, caused potential buyers to look elsewhere. There was a nationwide recession at the time, but Border's sales fell off more than would be expected as a result of the recession. As a result of the drop in sales, Border was unable to repay its bond obligations to the city. In 1993, the city brought a foreclosure action against 35 parcels within the business park. Border cross-complained for breach of the development agreement. Border was able to obtain financing and paid the delinquent assessments, although it remained obligated on outstanding penalties and other indebtedness. Border and the city agreed to a payment schedule. However, Border's financial difficulties continued, resulting in a judgment of foreclosure on some of its properties in 1995.[5]

---

[5] Some of the properties were sold in foreclosure sales in 1997. However, most of them were repurchased by Mr. De La Fuente or by business entities owned by the De La Fuente family.

Beginning in 1995, Border encountered further difficulties in selling properties within its business park as a result of the rerouting of truck traffic bound for the border crossing. In 1985, the federal government had opened a U.S.-Mexico border crossing in Otay Mesa. In 1993, the government closed the border crossing at San Ysidro to commercial truck traffic and routed all commercial truck traffic through the Otay Mesa border crossing instead. At the time, border-bound traffic was routed in such a way that it bypassed Border Business Park. In 1995, however, the city rerouted traffic in such a way that Border Business Park, which was located very near the truck crossing, was inundated with truck traffic. (Further details are discussed below.) Again, sales within the park suffered. In 1995, Border filed the present lawsuit, alleging breach of the development agreement. In 1996, Border filed for bankruptcy protection, and the breach of contract action was stayed. In 1998, the bankruptcy proceeding was dismissed, and proceedings resumed in the breach of contract suit. Border amended its complaint to add the two causes of action for inverse condemnation.

The issue of inverse condemnation was tried to the court.[6] The court found that the city's airport announcements, made without having first ascertained that the government of Mexico would cooperate, were unreasonable and amounted to a taking. It also found that the diversion of truck traffic caused a compensable impairment of Border's access to its property. A jury awarded Border $25.5 million in damages resulting from the city's airport planning activities, and $39.8 million for the interference caused by the city's rerouting of truck traffic. The jury also found that the city breached the development agreement and awarded Border $29.2 million in damages. The trial court awarded Border $10.3 million in prejudgment interest for the airport planning claim and $16.1 million for the traffic routing claim.

The city filed a motion for judgment notwithstanding the verdict and a motion for new trial. The court denied the motion for judgment notwithstanding the verdict and granted the motion for new trial on the breach of contract claim only. The city filed a timely notice of appeal and Border filed a timely notice of cross-appeal.

## DISCUSSION

### THE AIRPORT INVERSE CONDEMNATION CLAIM

Border's inverse condemnation claim was based on the theory that the city acted unreasonably during the period it was considering developing the

---

[6] Whether inverse condemnation occurred is decided by court trial, while damages are tried to a jury. (*Marshall v. Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1140 [268 Cal.Rptr. 559].)

airport in Otay Mesa, because it failed to ascertain that Mexico either had an interest in developing the so-called TwinPort airport, i.e., a jointly operated airport situated on both sides of the California-Mexico border, or would permit the use of its airspace if the city developed an international airport solely on the California side of the border. The source of Border's theory of inverse condemnation is *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] (*Klopping*).

■ Prior to *Klopping*, it was established that particularly oppressive acts by a public authority, involving a physical invasion or a direct legal restraint on the use of the property, could amount to a "de facto taking" of the property even without formal condemnation. (*Klopping, supra*, 8 Cal.3d at p. 46.) In *Klopping*, the court held that conduct falling short of a de facto taking can also result in liability. The court held that "when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property . . . ." (*Id.* at pp. 51–52.) In this case, the trial court found that the city's announcements concerning the airport proposal were "reckless" and amounted to inverse condemnation pursuant to *Klopping*.

On appeal, the city contends that the evidence is insufficient to support the inverse condemnation judgment as a matter of law, because, in the absence of an announced intention to condemn a property, conduct which falls short of an "acquiring stage" of the condemnation process does not support a *Klopping* claim. The city also contends that the evidence does not support the necessary finding that Border suffered "distinct or unique injury" and that the evidence does not support a finding that its conduct was unreasonable. Border counters that substantial evidence supports the court's finding that the city's conduct was reckless, and contends that unreasonable conduct during the precondemnation period, as found by the trial court in this case, is a separate basis for liability under *Klopping*. It contends that it was not required to prove that the city moved beyond the planning phase into the acquisition phase in order to prevail on that theory.[7]

---

[7] In the alternative, Border contends that the evidence shows that the city did reach the acquisition stage. Because we conclude that Border failed to meet its burden of proof on another element of the *Klopping* claim, we need not address that contention.

■ The city cites numerous cases which have held that an announced intention to acquire property or conduct which denotes an intent to acquire the property is essential to a *Klopping* claim. (See, e.g., *People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 355–356 [153 Cal.Rptr. 895]; *Toso v. City of Santa Barbara* (1980) 101 Cal.App.3d 934, 956–957 [162 Cal.Rptr. 210]; *Taper v. City of Long Beach* (1982) 129 Cal.App.3d 590, 615 [181 Cal.Rptr. 169]; *Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694, 708–709 [191 Cal.Rptr. 229]; *Guinnane v. City and County of San Francisco* (1987) 197 Cal.App.3d 862, 864–867 [241 Cal.Rptr. 787].) We note, however, that the express language of *Klopping*'s holding does not appear to require an announcement of an intent to condemn property, if liability is based on unreasonable conduct other than postannouncement delay. In *Klopping*, the court held that an action for inverse condemnation lies if the public agency acted improperly *"either* by unreasonably delaying eminent domain action *following an announcement of intent to condemn or* by other unreasonable conduct prior to condemnation." (*Klopping, supra*, 8 Cal.3d at p. 52, italics added.) In *Jones v. People ex rel. Dept. of Transportation* (1978) 22 Cal.3d 144 [148 Cal.Rptr. 640, 583 P.2d 165], the court declined to decide whether an announcement of an intent to condemn is essential to a *Klopping* claim because in that case a de facto taking occurred (*Jones v. People ex rel. Dept. of Transportation*, at p. 151), and the court has not yet resolved this question. We need not decide the issue in this case, however, nor do we need to decide whether the city's conduct was unreasonable or oppressive within the meaning of *Klopping*, because Border failed to adduce any evidence that the city's announcements concerning the proposed Otay Mesa airport subjected it to direct and special injury.[8]

■ In order to prevail on a claim of inverse condemnation, "there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury." (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 119–120 [109 Cal.Rptr. 799, 514 P.2d 111].) The landowner's property must be "singled out for singular and unique treatment" in contrast to other landowners who could be affected by the

---

[8] Border contends that because the city waived statement of decision, we must presume that the trial court found every fact necessary to support the judgment. Assuming that the absence of a statement of decision has any effect in this case (see discussion below), it merely requires us to review the record to determine whether there is substantial evidence to support the trial court's implied factual findings. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362].) Our review of the record demonstrates that there is *no* evidence to support the essential finding that Border suffered a unique injury from the airport announcements.

proposed public work. (*Smith v. State of California* (1975) 50 Cal.App.3d 529, 537 [123 Cal.Rptr. 745].) "[T]he widespread impact resulting from mere general planning is noncompensable." (*People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc., supra,* 91 Cal.App.3d at p. 355.) If the plaintiff's situation is "no different than that of any other landowner" in the area to be affected by the proposed plan, *Klopping* does not apply. (*Selby Realty Co. v. City of San Buenaventura, supra,* 10 Cal.3d at p. 120.)

Border produced no evidence that the airport proposal affected it in any unique manner. On the contrary, the undisputed evidence—adduced by Border itself—shows that the city's proposal concerning the airport affected owners of other business and industrial parks in Otay Mesa as well as Border, and in the same ways. Patrick Kennedy, an economist retained by Border to assess the economic impact of the city's alleged breaches of the development agreement, including the proposal to build the airport in Otay Mesa, testified that the SANDAG report, issued in May 1989, which described the proposal for the Otay Mesa airport, affected property values not just in Border Business Park but in other developments as well which were within the airport "footprint." There were 4,000 to 6,000 acres of industrial property within the footprint which would be affected. Border owned only 312 acres. Based on 17 real estate appraisal reports prepared for different properties in Otay Mesa during that period, Kennedy opined that the SANDAG report placed a cloud over the entire area.

In its opening statement, Border emphasized that the proposal showed a runway running "right across" its property. The SANDAG report did show that under at least one proposed configuration of the airport, some of the runways ran directly through Border Business Park. However, it showed runways running through other properties as well. Kennedy testified that the SANDAG report had a substantial impact "on anybody who's thinking about buying . . . in Border *or other parks that are underneath the runways.*" (Italics added.) Thus, Border was not subjected to any unique injury because of the proposed configuration of the runways.

Border contends that because neither party requested a statement of decision, we are limited to reviewing the judgment to determine whether there is substantial evidence to support the judgment on any theory, including its original claim, as alleged in the second amended complaint, that the city's entire course of conduct with respect to the breaches of the development agreement constituted inverse condemnation. Under that theory, Border contends, there is substantial evidence that it suffered special and unique

damages. Border contends that in the absence of a statement of decision, we cannot rely on the trial court's oral pronouncement of its ruling on the issue of liability to determine the legal theory on which the court based its decision.

Our review of the record persuades us that Border did not actually rely at trial on the theory of inverse condemnation as alleged in the second amended complaint. Rather, in its closing argument to the trial court on the issue of liability, Border asserted the *Klopping* theory with respect to the airport announcement and the impairment of access theory with respect to the traffic diversion. It did not assert its overarching theory that the city effected a taking by means of the series of breaches of the development agreement.

However, even if we assume, for the sake of argument, that Border did rely on the theory as alleged in the second amended complaint, we disagree that the absence of a statement of decision affects our review on appeal. The general rule is that in the absence of a statement of decision in a court trial, the reviewing court must conclude that the trial court made all findings necessary to support the judgment under any theory which was before the court. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646–648 [253 Cal.Rptr. 770]; *Gray v. Gray* (1921) 185 Cal. 598, 599 [197 P. 945].) However, this rule is merely a corollary of the general rule that a judgment is presumed to be correct and must be upheld in the absence of an affirmative showing of error. This presumption applies only on a silent record. (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 [194 Cal.Rptr. 773]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) In contrast, "When the record clearly demonstrates what the trial court did, we will not presume it did something different." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1384 [46 Cal.Rptr.2d 542].) Thus, even in the absence of a statement of decision, we are not compelled to resort to a presumption if the record adequately demonstrates the legal theory the court applied. For example, in *In re Marriage of Powers* (1990) 218 Cal.App.3d 626 [267 Cal.Rptr. 350], the court held that because the reporter's transcript adequately set forth the basis for the trial court's ruling, the absence of a statement of decision was not fatal to the appeal. The court noted that in *In re Marriage of Ditto*, not only was there no statement of decision, the judgment did not explain the law the court applied or its reasoning, and there was no reporter's transcript. (*In re Marriage of Ditto, supra*, 206 Cal.App.3d at p. 649, fn. 5.) Similarly, in *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489 [2 Cal.Rptr.2d 690], the court held that the absence of a statement of decision was not fatal to the appeal because the judgment itself set forth the legal basis for the trial court's award of attorney fees. (*Id.* at p. 1494, fn. 3.)

Here, the reporter's transcript shows that the court stated that it found the city liable for inverse condemnation based upon the city's unreasonable conduct in announcing the airport proposal without having first determined whether the Mexican government would cooperate and upon the impairment of access resulting from the traffic diversion. The court then instructed the jury to determine Border's damages, if any, based solely on those two theories. The court's statements plus the jury instructions foreclose any possibility that the court's finding of liability for inverse condemnation was based on any other legal theory. Moreover, the jury's verdict awarding damages on the airport cause of action was unquestionably based solely on the *Klopping* theory; it was not instructed on any other theory. We cannot uphold the damage award on an alternative theory which was not submitted to the jury. (*McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1146 [29 Cal.Rptr.2d 559].)

■ Because there was no evidence that the airport proposal directly and specially affected Border, as opposed to the entire section of Otay Mesa within the proposed airport site, the airport inverse condemnation claim fails as a matter of law.

## THE TRUCK TRAFFIC INVERSE CONDEMNATION CLAIM

■ An action for inverse condemnation can be based on substantial impairment of the right of ingress and egress, also known as the easement of access. (*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663 [39 Cal.Rptr. 903, 394 P.2d 719].) In its second cause of action for inverse condemnation, Border alleged that the city substantially impaired access to Border Business Park by diverting truck traffic in such a way that the traffic backed up on the streets adjacent to the business park, making "ingress and egress to [its] property difficult or impossible" and "severely and substantially affect[ing] the marketability of the Business Park to prospective tenants."

*Background*

The issue arose as follows. Prior to the mid-1980's, the sole point of entry between the United States and Mexico in California was the border crossing at San Ysidro. In about 1985, the federal government opened a second border crossing in Otay Mesa. In the mid-1990's, San Ysidro was closed to commercial truck traffic, and Otay Mesa became the sole border crossing for trucks. At that time, the main route to the border crossing was Otay Mesa Road, a city-operated street, which turned into State Highway 905 a few miles north of the border. Otay Mesa Road is the main thoroughfare in the area, and to avoid having long lines of traffic backed up along Otay Mesa

Road as well as the commingling of truck and automobile traffic, the city decided to reroute truck traffic.

Choosing among the available alternatives, all of which presented problems, the city elected, as an interim solution, to route truck traffic from Otay Mesa Road south onto La Media, then east on Siempre Viva. It extended Drucker Road north to intersect with Siempre Viva and built a road to the border crossing. City traffic engineers anticipated that if the traffic backed up along Drucker Road and onto Siempre Viva, it would affect only the property on the south side of Siempre Viva, which was at that time largely undeveloped. Border Business Park is on the north side of Siempre Viva; La Media is immediately west of the park.[9]

When the city first decided to reroute the truck traffic, La Media was insufficiently developed to accommodate it. During the first six to nine months after the city routed truck traffic away from the Otay Mesa Road/Highway 905 route, it diverted the traffic through Border Business Park while it improved La Media. Even after La Media opened to truck traffic, some truck drivers continued to drive through the business park. Others continued to approach the border crossing from Otay Mesa Road/Highway 905 via the westbound lanes of Siempre Viva, turning left onto Drucker Road. However, in doing so, they cut into the queue of traffic which was lined up in eastbound lanes of Siempre Viva after having followed the designated route. Confrontations between truck drivers who had waited in line and those who had jumped the line ensued, including fistfights. The city installed concrete barriers called K-rails which prevented trucks from turning left onto Drucker Road from the westbound side of Siempre Viva. The city erected signs to direct the errant trucks back to La Media via the public roads which ran through Border Business Park. The K-rails alleviated the congestion at the intersection of Siempre Viva and Drucker Road, and also eliminated most of the backup in the westbound lane of Siempre Viva.

Traffic often backed up in the eastbound lanes of Siempre Viva to La Media, and sometimes up La Media as well. There was usually no traffic backup in the morning, but there was a backup every afternoon. It would sometimes begin as early as 1:00 p.m., but usually it would begin between 3:00 and 4:00 or 4:30. However, the backup usually abated after 5:00 p.m., when the border crossing closed.

The truck traffic caused noise and diesel fumes which affected the park. There was also some physical damage to the park. The congestion on the

---

[9] Both parties refer to maps which were produced by the city and inserted into its opening brief. The maps were not trial exhibits. Border inserted them into its brief as well, and adopts them to illustrate its arguments. It describes them as being generally accurate. For clarity, we have attached copies of representative maps to this opinion as an appendix.

surrounding streets made it difficult for business owners and employees to enter and exit the park. Sales of property in the park suffered as a result of the congestion.

The traffic problem was resolved after the trial, when, sometime in 2001, the city completed a permanent truck route to the border which had far less effect on traffic around the business park. Thus, Border sought damages for the period from January 1, 1995, the date the trial court found to be the effective date of the rerouting of truck traffic, through the trial in December 2000.

*Standard of Review*

We must first determine the applicable standard of review. Border takes the position that substantial impairment of access is solely a question of fact, and that we must uphold the trial court's finding of substantial impairment because there was testimony that the impact of the truck traffic was "both substantial and unnecessary" and that at times there was "total gridlock" on the streets surrounding the business park. The city contends that we can determine as a matter of law that there was no compensable impairment of access. It argues that inverse condemnation "may not be based on diminished convenience in the use of abutting streets, but only on proof of a 'substantial impairment' of access beyond a change in traffic flow or increased circuity of travel." However, it contends, the evidence shows that there was a means of access to the park at all times and that the traffic backup merely required the use of more circuitous routes at times to enter or leave the property.

The standard of review of this issue is in dispute among the courts. The California Supreme Court has held both that whether there is a substantial impairment of the right of access is a question of fact (*Rose v. State of California* (1942) 19 Cal.2d 713, 728 [123 P.2d 505]) and that it is a question of law (*Breidert v. Southern Pac. Co., supra,* 61 Cal.2d at p. 664). It has not resolved the apparent discrepancy. In *San Diego Metropolitan Transit Development Bd. v. Price Co.* (1995) 37 Cal.App.4th 1541 [44 Cal.Rptr.2d 705], Division One of this court concluded that because the determination whether substantial impairment exists is primarily factual, the proper standard of review is substantial evidence. It concluded that the characterization of the issue of substantial impairment as one of law in some of the cases "means only that the compensability issue is a court issue and not a jury issue; the jury issue is limited to the amount of damages." (*Id.* at p. 1548; accord, *Perrin v. Los Angeles County Transportation Com.* (1996) 42 Cal.App.4th 1807, 1812 [50 Cal.Rptr.2d 488].) However, in a case decided very shortly before *San Diego Metropolitan Transit Development Bd. v. Price Co.* the Second District Court of Appeal held that "the initial question whether there

has been a substantial impairment of access is in truth a mixed question of law and fact, decided predominately as a question of law." (*Brumer v. Los Angeles County Metropolitan Transportation Authority* (1995) 36 Cal.App.4th 1738, 1745 [43 Cal.Rptr.2d 314] (*Brumer*).)

We agree with the *Brumer* court. A mixed question of law and fact that is predominantly one of law is one which " 'requires a critical consideration, in a factual context, of legal principles and their underlying values' rather than merely 'experience with human affairs.' [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].) As we discuss below, the right of access is limited by well-defined legal principles, and the threshold question—whether there has been an impairment of that right—is primarily a legal one, in that it requires consideration of legal principles "in the mix of fact and law." (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960].) The more fact-driven inquiry, whether any impairment which has occurred is sufficiently substantial to be actionable (*Brumer, supra,* 36 Cal.App.4th at p. 1745), arises only if there has been a legally cognizable impairment of the right of access. (See *Breidert v. Southern Pac. Co., supra,* 61 Cal.2d at p. 665 [lack of access to the next intersecting street is a factor in finding impairment of the "general right" of access].) The issue is thus a mixed question in which legal considerations predominate, at least at the threshold.

In reviewing a mixed question of law and fact, we defer to the express or implied factual findings of the trial court and determine the applicable legal principles de novo. The standard which applies to the third step of the analysis, applying the law to the facts, depends upon whether factual or legal issues predominate. Where, as in this case, the issue is predominately one of law, we review it de novo. (*Ghirardo v. Antonioli, supra,* 8 Cal.4th at pp. 800–801.)

*The Evidence Is Insufficient as a Matter of Law to Support the Inverse Condemnation Claim*

■ As noted above, the easement of access "consists of the right to get into the street upon which the landowner's property abuts and from there, in a reasonable manner, to the general system of public streets." (*Breidert v. Southern Pac. Co., supra,* 61 Cal.2d at p. 663.) The city correctly points out that street alterations which cause significantly increased traffic or which reduce but do not eliminate access to a property do not give rise to a compensable taking. (*People v. Ayon* (1960) 54 Cal.2d 217, 223–224 [5 Cal.Rptr. 151, 352 P.2d 519]; *Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 167 [24 Cal.Rptr.2d 607].) Here, however, Border does not allege that there was merely an increase of traffic which caused some

inconvenience or which reduced access to its property. Rather, Border contends that there was "total gridlock," both around the property and within it, which rendered ingress and egress virtually nonexistent.

Although we have found no cases with a similar factual situation, we will assume, for the sake of discussion, that a rerouting of traffic which caused gridlock for a period of several hours every day would constitute a substantial impairment of the right of access. However, "gridlock" denotes more than heavy or slow-moving traffic. Rather, it denotes traffic congestion on a grid of intersecting streets which prevents traffic from moving in any direction. (Webster's 9th New Collegiate Dict. (1991) p. 537.) Here, there is no evidence which supports Border's contention that there was gridlock which prevented all access to the business park.

First, there is no evidence that the truck traffic "often comes to a complete stop in *both directions*" on Siempre Viva, as Border claims. The exhibits it refers to show traffic backed up on Siempre Viva and La Media only, and in only one direction on either street.[10] Border claims that Richard Schaaf, a city traffic officer, testified that traffic was often blocked in both directions on Siempre Viva. This is not true. Rather, Officer Schaaf testified that the backup normally affected only the eastbound lanes. Occasionally, he said, a truck attempting to make an illegal turn would block all three lanes of Siempre Viva. When that happened, though, he would direct the truck out of the lane, make it go to a safe area, issue a citation, and send it eastbound. Thus, any blockage would be transitory and would not result in gridlock.

Rene Romero, the second witness Border cites, did not say that traffic often comes to a complete stop in both directions on Siempre Viva. Mr. Romero testified that when the trucks are backed up, it is impossible to drive through in the eastbound lane. He testified that driving in the opposite direction is hazardous because the truck drivers get impatient and some will enter the lane for oncoming traffic—i.e., the westbound lane—to try to pass other trucks in the queue. Thus, he did not say that it was impossible to drive westbound on Siempre Viva because of gridlock, but rather that it was hazardous to do so because of trucks driving eastbound in the westbound lane.

There is also no evidence that traffic ever encircled the business park, as Border claims. The park is bounded on the north by Airway Road, on the east by Harvest Road, on the south by the westbound lane of Siempre Viva and on

---

[10] We decline Border's requests that we watch a videotape it has provided as part of the respondent's appendix. The videotape was not admitted into evidence during the trial and was not shown to the court or to the jury.

the west by the northbound lane of La Media. There is no testimony that traffic backed up on all of these streets.

Nor is there evidence that there was ever gridlock on any of the streets surrounding the park, except, for a short period of time, at Siempre Viva and Drucker Road. Before the city installed the K-rails, traffic attempting to turn onto Drucker Road from both directions on Siempre Viva apparently caused periods of true gridlock at that intersection. However, the business park has entrance and exit roads intersecting with city streets on all four sides of the park. There is no evidence of gridlock on any of the streets except Siempre Viva, and on Siempre Viva, the only point of gridlock was the intersection with Drucker Road. Gridlock at a single intersection does not amount to "total gridlock" on all the streets surrounding the business park.

There is also no evidence to support Border's claim that there was solid gridlock within the park every day and that drivers would jump the curbs inside the park "or otherwise proceed onto the private property of Park tenants" or "*make their own dirt roads in the Park* to avoid the queue on the paved streets." Officer Schaaf testified that trucks used the business park to make U-turns, as well as using "other dirt lots" in the vicinity. However, he did not identify those lots as being within the park, as Border implies. There was property west of La Media and south of Siempre Viva, not owned by Border, which consisted of dirt lots. The officer also testified that he had occasionally investigated damage to private property within the park allegedly caused by trucks, but he did not describe the nature of the damage he saw, nor did he say that any such damage was ever determined to have been caused by trucks. And, he did not testify either directly or by implication that trucks "made their own dirt roads" within the park, as Border claims, nor did he testify that he observed gridlock within the park. Harry Otis, a business owner with property in the park, did not testify that truck drivers drove off the paved roads to avoid gridlock, as Border asserts. Rather, he testified that on some occasions *he* used "cross-country tactics to get off the roads" and would "go around" to gain access to his property.

Border cites no other evidence that truck traffic created gridlock within the park or resembled a "serpentine waiting line at a Disneyland ride." Even Mr. De La Fuente did not describe anything approaching gridlock. Rather, he said that during the time La Media was being improved, there was a daily line of trucks which "snaked" through the park. He made it clear, moreover, that the most serious problems with truck traffic within the park persisted only for a period of six to nine months while the city improved La Media to accommodate truck traffic. Border sought damages for six *years* of impaired access—from January 1, 1995, the date the court found to be the effective date of the traffic rerouting, through the trial in December 2000.

Taken as a whole, and even when viewed in the light most favorable to Border, the evidence fails to establish that the truck traffic ever completely prevented ingress or egress. The question thus becomes whether the evidence supports the conclusion reached by the trial court, that the traffic problems amounted to a substantial impairment of the right of access. We conclude that as a matter of law, the evidence does not support a finding of compensable interference with the right of access.

■ The right of access is not unlimited. "Not every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation." (*Breidert v. Southern Pac. Co., supra,* 61 Cal.2d at pp. 663–664.) As long as there is access to the abutting road and from there to the next intersecting street in at least one direction, there is no legally cognizable impairment of access. (*People v. Ayon, supra,* 54 Cal.2d at pp. 223–224.)

■ The maps Border relies upon show that there was access by a number of routes from the business park's six entrance/exit roads to the general system of streets. There is a network of roads within the park which provide access from most of the parcels to all of the entrance/exit roads. There is an exit which intersects the northbound lane of La Media, as well as two exits which lead to Airway Road, which also intersects the northbound lane of La Media. La Media intersects Otay Mesa Road to the north of the park. Otay Mesa Road apparently intersects Interstate 805, and is apparently the main thoroughfare in the area. There was no evidence that the traffic backup affected the northbound lanes of La Media. The only evidence that traffic backed up in the southbound lane of La Media as far north as Airway Road, limiting access via the La Media entrance, is the testimony of Harry Otis, who owned property within the business park. Mr. Otis testified that sometimes, rather than using the La Media entrance to the park, he would instead have to come down Highway 905 to Airway Road and enter the park via Airway Road. However, he did not indicate that there was ever a time when he was unable to gain access via Airway Road.[11] Thus, the evidence fails to show that there was ever a time when there was no access by means of at least one entrance to the park. At most, the traffic backups required tenants of the park to use an entrance which was less convenient.[12] Interference with

---

[11] In closing argument, Border's attorney asserted that Mr. Otis testified that there was sometimes traffic encircling the park, resulting in gridlock and an inability to enter the park. We are unable to discern the basis for this assertion from the transcript of Mr. Otis's testimony.

[12] Mr. Otis testified that on some occasions, he had to use "cross-county tactics to get off the roads and actually go to the outside and go around" to gain entry to the park when access was blocked in one direction and he had to "wait" to gain access from another direction. The meaning of the testimony about going "to the outside" and going "around" is unclear.

access which merely requires greater "circuity of travel" is not compensable. (*People v. Russell* (1957) 48 Cal.2d 189, 195 [309 P.2d 10].)

There are a few parcels within the business park which have no access to the streets within the park, such as several which front on Siempre Viva. Their means of ingress and egress is apparently limited to driveways which lead directly into the westbound lane of Siempre Viva. Border attempted to show that those properties completely lacked a means of ingress and egress because of the traffic problems on Siempre Viva. This was refuted by Officer Schaaf, who rejected the suggestion made by Border's attorney that the traffic backup on Siempre Viva "covers" the entrances and exits to the business park. The maps relied on by both parties make it clear that even when the traffic was backed up in the eastbound lanes of Siempre Viva, the properties in question would have access to the westbound lane. A driver leaving those properties could travel west to La Media and thence north to Otay Mesa Road. Even during the relatively short period when there was gridlock at Siempre Viva and Drucker Road, before the city installed the K-rails, the gridlock would not have affected egress from those properties which lie to the west of Drucker Road.[13] Ingress to those properties could be achieved, even when there was gridlock to the west of Drucker Road, by traveling through the business park from the north and exiting into the westbound lane of Siempre Viva either at Drucker Road or via the exit road to the west of Drucker Road. The properties along Siempre Viva which lie to the east of Drucker Road have access to other routes for both ingress and egress, either by driving through the park to Airway Road or by using Harvest Road. Thus, even though access might have been circuitous and perhaps slow because of the volume of traffic, there was nevertheless a reasonable means of ingress and egress at all times.

 Border asserts that courts "have imposed liability where, as here, there is unnecessary and substantial traffic diversion," but cites no cases which have actually held that a city can be liable for rerouting of traffic which results in less than a complete denial of access. Border cites only

---

However, it is clear that he did have access to his property from Airway Road. Rene Romero, another owner of property within the park, said that at times it was impossible to drive through on the eastbound lanes of Siempre Viva, but he did not testify that he was ever unable to reach his property by an alternate route. John Mawhinney, a real estate appraiser who testified for Border as to the effect the traffic had on sales within the park, testified that the two- to three-hour period of "gridlock" required "a certain amount of circuity of travel" for tenants and vendors and thus inconvenienced them. He did not testify that he had ever observed or that anyone had ever told him that tenants or vendors were ever completely unable to enter or exit the park.

[13] The court found that the city rerouted the traffic effective January 1, 1995. Officer Schaaf testified that the K-rails were installed sometime in 1995 or 1996.

*Heimann v. City of Los Angeles* (1947) 30 Cal.2d 746 [185 P.2d 597].[14] However, there was no allegation in that case that any damages resulted from traffic diversion. Rather, the issue in that case was an alleged loss of use of property during the construction of a viaduct, resulting from the piling of earth, rock and other material in the streets and the erection of sawmills, sheds and other structures, the accumulation of waste materials on and near the plaintiffs' premises and the partial obstruction and closing of streets. (*Id.* at pp. 754–755.) In contrast, the courts have held that exercise of a city's power to regulate traffic is not actionable under a theory of impairment of access: "The property owner has no constitutional right to compensation simply because the streets upon which his property abuts are improved so as to affect the traffic flow on such streets. If loss of business or of value of the property results, that is noncompensable. It is simply a risk the property owner assumes when he lives in modern society under modern traffic conditions." (*People v. Ayon, supra*, 54 Cal.2d at pp. 223–224.) If some reasonable means of access remains, even if it is impeded by heavy traffic, there has been no compensable impairment of the right of access. (*Friends of H Street v. City of Sacramento, supra*, 20 Cal.App.4th at p. 167; *People ex rel. Dept. of Public Works v. Wasserman* (1966) 240 Cal.App.2d 716, 730 [50 Cal.Rptr. 95].)[15]

We next address Border's claim that the judgment can be affirmed on the alternate theory, which it asserted at trial, that the noise, dust and fumes generated by the idling trucks was "not far removed from a direct physical intrusion" or that it amounted to a nuisance.[16] This argument fails because the case was not submitted to the jury on that theory. Rather, the trial court instructed the jury that it had determined that the diversion of truck traffic

---

[14] Border also claims that the city's traffic engineer testified that the impact of the truck traffic on the business park was "both substantial and unnecessary." We find no such testimony. Rather, on the reporter's transcript page cited by Border, the city traffic engineer testified that the city was aware that the border-bound truck traffic would cause problems regardless of the route it chose. Elsewhere, he explained that the city chose the route it did because it expected it to cause the least disruption of any of the routes available to it.

[15] Border contends that *Rose v. State of California, supra*, 19 Cal.2d 713 compels the conclusion that access was substantially impaired and thus compensable. It contends that in *Rose*, construction which resulted in narrowing the road fronting the plaintiff's property was deemed to be a substantial impairment of the right of access. However, in *Rose*, the narrowing of the road did not substantially impair the right of access for the use to which the property was then being put. The property was then in use as an orchard or farm, including a residence. However, it was zoned industrial. The narrowing of the road resulted in frontage which was not wide enough for two trucks to pass in opposite directions. It thus rendered the property completely unusable for any "large industrial use" and therefore diminished the property's market value. (*Id.* at pp. 718, 734, 735–736.) Here, in contrast, the record shows only that ingress and egress became more difficult and more circuitous for a few hours each day, and only temporarily. The situation in *Rose* is not analogous.

[16] The source of this theory is *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 713 [66 Cal.Rptr.2d 630, 941 P.2d 809].

amounted to a partial or temporary taking of the property, and that Border's right of access to the property had been impaired as a result of the city's actions in routing traffic to the border crossing. It instructed the jury to determine the extent, if any, to which Border's property had been decreased in value by reason of the impairment of access. That was the sole basis upon which the court instructed the jury with respect to damages resulting from the diversion of traffic; it did not instruct the jury on the nuisance theory. We cannot uphold a judgment on the basis of a legal theory which was not submitted to the jury. (*McLaughlin v. National Union Fire Ins. Co., supra*, 23 Cal.App.4th at p. 1146.)

Because the evidence does not support the judgment of inverse condemnation based on the traffic diversion as a matter of law, we will reverse the judgment on that cause of action as well.

## THE CITY'S MOTION FOR NEW TRIAL WAS PROPERLY GRANTED

*Introduction*

In its cross-appeal, Border asserts that the trial court erred in granting the city's motion for a new trial on Border's breach of contract claim. Border contends that the court erroneously concluded that the doctrine of res judicata barred recovery for any breach which occurred before June 23, 1994, because the court was operating under the mistaken belief that there was a final judgment in a prior lawsuit between the parties. In the prior action, the court sustained without leave to amend the city's demurrer to Border's cross-complaint, in which it asserted the same breach of contract claims it asserted in this case. However, no judgment of dismissal was filed. Border asserts that the order sustaining the demurrer is not a final judgment and has no res judicata effect. Therefore, Border contends that we should reverse the order granting the city a new trial on the breach of contract claim.

 The parties devote considerable argument to whether the court applied res judicata, as it stated in its ruling, or in reality applied collateral estoppel. The distinction between the two doctrines is significant because res judicata requires a final judgment, while an adjudication which is not a final judgment may, under some circumstances, be given preclusive effect under the doctrine of collateral estoppel. It is undisputed that there was no judgment entered in the prior lawsuit.[17] Border contends that the distinction is significant as well because collateral estoppel applies only to issues which were actually litigated, while res judicata applies to matters which were raised as

---

[17] Both the underlying facts and the legal issues are discussed in detail below.

well as to matters which could have been raised. It points out that the trial court expressly stated that it was not applying collateral estoppel but res judicata, because the effect of its ruling was to preclude relitigation of some issues which were not actually litigated in the demurrer in the prior action. It argues that the court's determination of the new trial motion cannot be sustained because there is unquestionably no final judgment which satisfies the requirements of res judicata.

We need not determine whether the court correctly described the doctrine it applied to determine that relitigation of the specified issues was precluded, nor whether it applied the doctrine correctly. As Border correctly posits, the order granting the new trial is subject to our independent review.[18] Under that standard, we decide a legal issue without regard to the trial court's analysis. (*Ghirardo v. Antonioli, supra*, 8 Cal.4th at p. 799.) We review the court's ruling, not its reasoning, and we will uphold its ruling if it is correct on any theory of law applicable to the case. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

### Background

The issue arose as follows. In 1994, the city filed an action against Border to foreclose on assessment district liens. (*City of San Diego v. De La Fuente Business Park, Inc.* (Super. Ct. San Diego County, 1995, No. 676625)).[19] (The parties refer to this case as *De La Fuente II*.) Border filed a cross-complaint alleging breach of the development agreement. The city obtained an order severing the cross-complaint from the foreclosure action. In February 1995, the city obtained a judgment in the foreclosure action. It then filed a demurrer to the cross-complaint on grounds that the cross-complaint failed to allege compliance with the claim presentation requirements of Government Code section 910 et seq., which the city contended was a prerequisite to the cross-complaint. Border opposed the demurrer, but after a hearing the demurrer was granted without leave to amend based on noncompliance with Government Code section 910 et seq. In May 1995, the court issued a minute order stating its ruling, but no judgment of dismissal was filed.

---

[18] An order granting a new trial is normally reviewed for abuse of discretion. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 859.) However, "any determination underlying any order is scrutinized under the test appropriate to [that] determination." (*Ibid.*) If a motion for new trial depends upon the resolution of a question of law, we review the order granting the motion de novo. (*Ibid.*) Here, the new trial motion depends on the applicability of res judicata or collateral estoppel. Both are questions of law which are reviewed independently. (*Roos v. Red* (2005) 130 Cal.App.4th 870, 878 [30 Cal.Rptr.3d 446]; *Allstate Ins. Co. v. Mel Rapton, Inc.* (2000) 77 Cal.App.4th 901, 907 [92 Cal.Rptr.2d 151].) Therefore, we review the basis for the new trial order independently.

[19] Border Business Park changed its name to De La Fuente Business Park in 1987 and then changed its name back to Border Business Park in 1997.

On June 23, 1995, Border presented a Government Code claim to the city, asserting breach of the development agreement. The city denied the claim, and on September 22, 1995, Border filed the instant action, again alleging breach of the development agreement.

The city filed a motion in limine to exclude evidence of and damages for alleged breaches which occurred more than one year before June 23, 1995, the date Border filed its Government Code claim, arguing that any such breaches were time-barred.[20] It also argued that because the issue was decided adversely to Border in the prior case, Border was estopped from denying that the government claims act applied. The city erroneously asserted that the order sustaining the demurrer had been reduced to a final judgment on the merits.

The trial court denied the motion in limine, and the breach of contract cause of action was submitted to the jury based on evidence of breaches of the development agreement which occurred both before and after June 23, 1994. The jury found the city liable for breach of the agreement and awarded Border $29 million in damages. The verdict did not apportion the damages with respect to any particular alleged breach or breaches.

The city filed a motion for judgment notwithstanding the verdict and a motion for new trial. The trial court rejected the city's argument that the entire breach of contract claim was barred by application of res judicata. However, it held that the ruling on the demurrer in the prior action conclusively established that Border had not filed a Government Code claim up to the time it filed its cross-complaint in that action. It also held that Border's assertions that a Government Code claim was not required or that compliance with the claim requirement was waived or excused under any theory were conclusively adjudicated adversely to Border in the prior proceeding because Border could have raised those contentions in its opposition to the demurrer, but did not do so. As a result, the court held that the prior ruling established that any breach which occurred more than one year before Border filed its Government Code claim—i.e., any breach which occurred before June 23, 1994—was time-barred. The court granted a new trial on both liability and damages, excluding breaches which occurred before June 23, 1994.

---

[20] Government Code section 905 provides that all claims for money or damages against a local public agency (with exceptions not pertinent here) must be presented in accordance with the claims procedures set forth elsewhere. Government Code section 911.2, subdivision (a), provides that all claims other than a claim relating to a cause of action for death or injury to person or property shall be presented no later than one year after the accrual of the cause of action. Claims arising more than one year prior to presentation of the claim are barred. (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 960–961 [5 Cal.Rptr.3d 520].)

*Direct or Collateral Estoppel Precludes Relitigation of Issues Which Were Finally Adjudicated in a Prior Proceeding Between the Same Parties*

 "Res judicata prohibits the relitigation of claims and issues which have already been adjudicated in an earlier proceeding. The doctrine has two components. ' "In its primary aspect the doctrine of res judicata [or 'claim preclusion'] operates as a bar to the maintenance of a second suit between the same parties on the same cause of action." . . . The secondary aspect is "collateral estoppel" or "issue preclusion," which does not bar a second action but "precludes a party to an action from relitigating in a second proceeding matters litigated and determined in a prior proceeding." ' [Citations.]" (*Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1335 [79 Cal.Rptr.2d 763].)

When issue preclusion arises from successive suits on different claims, it is referred to as collateral estoppel. If, as in this case, the second action is on the same claim, issue preclusion based on the earlier determination is described as direct estoppel. (*Sabek, Inc. v. Engelhard Corp.* (1998) 65 Cal.App.4th 992, 997 [76 Cal.Rptr.2d 882]; Rest.2d Judgments, § 17, com. c, pp. 149–150; Rest.2d Judgments, § 27, com. b, pp. 251–252.) Both collateral and direct estoppel have the " 'dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.' [Citation.]" (*Sabek, Inc. v. Engelhard Corp.*, at p. 997.)

Here, the trial court precluded only relitigation of specified issues; it did not bar relitigation of Border's breach of contract claim in its entirety, but limited the scope of the claim to damages which accrued after a certain date. The question we address, therefore, is whether the prior lawsuit precludes relitigation of those issues. If it does, we must uphold the order granting the new trial.[21]

---

[21] Border contends that because the order granting new trial was based on the ground that damages were excessive, the order cannot be affirmed except on that ground, and then only if there is "no substantial basis" for the determination that damages were excessive. The order granting new trial was based on the ground that damages were excessive because the trial court erred as a matter of law by failing to accept as conclusive the ruling in a prior lawsuit that damages which accrued before June 23, 1994, were barred by the statute of limitations. If the prior lawsuit did operate as a bar to Border's claim for damages which accrued before that date, damages were excessive as a matter of law, to the extent that they were based on the time-barred breaches.

*The Order Sustaining the Demurrer in the Prior Action Is a Final Judgment for Purposes of Issue Preclusion*

 It is undisputed that no judgment was entered in the prior lawsuit, and Border contends that the order sustaining the demurrer is insufficient to constitute a final judgment. However, for purposes of issue preclusion, as opposed to res judicata, " 'final judgment' includes *any* prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." (Rest.2d Judgments, § 13, italics added; see *Sabek, Inc. v. Engelhard Corp., supra,* 65 Cal.App.4th at p. 998; *Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932, 936 [190 Cal.Rptr. 29].)

The city cites two cases in which an order, rather than a judgment, was found sufficiently final for purposes of issue preclusion.[22] In *Rymer v. Hagler* (1989) 211 Cal.App.3d 1171 [260 Cal.Rptr. 76], the court held that a determination of coverage by a Workers' Compensation Appeals Board judge was sufficiently final to preclude relitigation of the same issue in a civil proceeding based on the same industrial injury which was the subject of the workers' compensation claim. The court reasoned that the order was a final order within the meaning of Labor Code section 5900, subdivision (a), and that deeming it a final judgment for purposes of issue preclusion served the policy underlying the doctrine of issue preclusion, i.e., protecting parties from endless litigation. (*Rymer v. Hagler,* at pp. 1180–1181.) Similarly, in *Security People, Inc. v. Medeco Security Locks* (N.D.Cal. 1999) 59 F.Supp.2d 1040, the federal district court held that a disposition by summary judgment "is a decision on the merits, and it is as final and conclusive as a judgment after trial" for purposes of issue preclusion, even though the ruling was later vacated pursuant to a settlement. (*Id.* at p. 1045.) In addition, we note that courts of both this state and others have held that an arbitration award has collateral estoppel effect, "so long as the arbitration had the elements of an adjudicatory procedure." (*Kelly v. Vons Companies, Inc., supra,* 67 Cal.App.4th at p. 1336.)

Border cites *Service Employees International Union v. Hollywood Park, Inc.* (1983) 149 Cal.App.3d 745 [197 Cal.Rptr. 316], which holds that an order sustaining a demurrer is not a final judgment for purposes of res judicata.

---

[22] The other cases it cites in which this "lesser" finality rule was applied all involve judgments—either a judgment which was arguably nullified by settlement and dismissal of an appeal (*Sandoval v. Superior Court, supra,* 140 Cal.App.3d at pp. 936–940; *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1840 [54 Cal.Rptr.2d 176]), or a judgment which was not on the merits but nevertheless conclusive on the issue sought to be relitigated. (*Sabek, Inc. v. Engelhard Corp., supra,* 65 Cal.App.4th at p. 998.)

(*Id.* at p. 756.) However, *Service Employees International Union v. Hollywood Park, Inc.* involves claim preclusion rather than issue preclusion, and it therefore does not address the question whether an order sustaining a demurrer on substantive grounds can be deemed a final judgment for purposes of issue preclusion.

 A prior adjudication of an issue in another action may be deemed "sufficiently firm" to be accorded preclusive effect based on the following factors: (1) whether the decision was not avowedly tentative; (2) whether the parties were fully heard; (3) whether the court supported its decision with a reasoned opinion; and (4) whether the decision was subject to an appeal. (*Sandoval v. Superior Court, supra,* 140 Cal.App.3d at p. 936; Rest.2d Judgments, § 13, com. g, p. 135.) Here, the applicability of the Government Claims Act to the breach of contract claim was litigated in connection with the demurrer in the prior lawsuit, and the court issued an order, which was in no way tentative, sustaining the demurrer and stating the basis for its decision. If Border had wished to challenge the ruling, it could have requested entry of judgment and appealed the dismissal of its cross-complaint. Thus, the order sustaining the demurrer meets the criteria for a final judgment for purposes of issue preclusion. (*Sandoval v. Superior Court,* at p. 936.) Moreover, Border effectively acquiesced in the ruling by failing to obtain a final judgment and filing an appeal and instead promptly presenting a Government Code claim asserting the breach of contract claim. Having decided not to pursue the remedy available to it, it should not now be able to contend that the order is not a final adjudication of the issues it addressed. Under these circumstances, the order sustaining the demurrer precludes relitigation of the issues already adjudicated.

Border now seeks a ruling that breaches which occurred before June 23, 1994, were not time-barred, based on theories which it did not assert in its opposition to the demurrer. It contends that the development agreement contained an express waiver of any statute of limitations and eliminated the requirement for filing a Government Code claim; that because the development agreement is an executory contract, Border could wait until December 31, 2007, the end of contractual period, to file any claim for breach of the agreement; and that the claim is timely under the doctrine of continuing wrongs.

 Issue preclusion bars relitigation of any issue which was actually litigated in the prior proceeding. (*Kelly v. Vons Companies, Inc., supra,* 67 Cal.App.4th at p. 1339.) For purposes of issue preclusion, however, an

"issue" includes any legal theory or factual matter which could have been asserted in support of or in opposition to the issue which was litigated. (*Sutphin v. Speik* (1940) 15 Cal.2d 195, 202 [99 P.2d 652].) " 'Despite the established principle that the estoppel results only on *issues actually litigated*, it is often said that a judgment is binding as to all *matters* which were raised or *which might have been raised*. [Citation.] Is this latter statement incorrect as applied to subsequent suits on a different cause of action? The conflict appears to be largely one of expression, and it may be resolved if "issues" is given a reasonable meaning. Clearly a former judgment is not a collateral estoppel on *issues which might have been raised but were not*; just as clearly it is a collateral estoppel on issues which were raised, *even though some factual matters or legal arguments which could have been presented were not.*' (3 Witkin, Cal. Procedure [former], § 63, p. 1949.)" (*Bleeck v. State Board of Optometry* (1971) 18 Cal.App.3d 415, 429 [95 Cal.Rptr. 860], original italics.)[23] Any of the contentions Border now asserts could have been raised in its opposition to the demurrer. The order sustaining the demurrer therefore precludes consideration of those contentions at this juncture.

## THE CITY'S REQUEST FOR JUDICIAL NOTICE

On February 17, 2006, the city filed a request that we take judicial notice of documents filed in two cases now pending in the Superior Court of San Diego County, *National Enterprises, Inc. v. City of San Diego* (No. 730011), and *Otay Acquisitions, L.L.C. v. City of San Diego* (No. 753247). The city asserts that the plaintiffs in those cases are among the entities determined in this case to be alter egos of Roque De La Fuente II, and it asks this court to issue an opinion "clarifying" the res judicata effect of the judgment in this case on the two pending cases. We deny the request. The parties have raised no issue in this appeal concerning the alter ego finding made by the trial court, and the documents submitted by the city thus have no relevance to any issue in this appeal. Thus, any ruling we might make on the res judicata effect of the judgment in this case on cases which are not before us would be advisory and therefore beyond our jurisdiction. (*People ex rel. Lynch v. Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126]; *Denny's, Inc. v. City of Agoura Hills* (1997) 56 Cal.App.4th 1312, 1329 [66 Cal.Rptr.2d 382].)

---

[23] The quotation in *Bleeck v. State Board of Optometry* from the superseded edition of Witkin's California Procedure appears verbatim in the current edition. (7 Witkin, Cal. Procedure (4th ed. 1997), Judgment, § 359, pp. 923–924.)

## DISPOSITION

The judgments on the inverse condemnation claim regarding the airport and on the inverse condemnation claim regarding truck traffic are reversed. The trial court is directed to enter judgment for the city on those claims. The order granting the motion of the city for a new trial on the claim of breach of contract is affirmed. Costs on appeal are awarded to the city.

Richli, J., and Gaut, J., concurred.

The petition of appellant Border Business Park, Inc., for review by the Supreme Court was denied January 3, 2007, S147706. Corrigan, J., did not participate therein.