Filed 3/28/25  San Diego Tenant Union v. San Diego Housing Commission CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO TENANT UNION et al., | D081773 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2019-00012582-CU-WM-CTL) |
| SAN DIEGO HOUSING COMMISSION, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Quarles & Brady, Jeffrey P. Michalowski and Kelly E. Kagan for Defendant and Appellant.

Pease Law, Parisa Ijadi-Maghsoodi, Bryan W. Pease; Disability Rights California, Navneet Grewal; James D. Crosby; Jeff Lewis Law and Jeffrey Lewis for Plaintiffs and Respondents.

## INTRODUCTION

The San Diego Housing Commission (Housing Commission) appeals the trial court's award of attorney fees to plaintiffs San Diego Tenant Union and Darlisa McDowell (Tenants). Tenants filed this lawsuit seeking to force the Housing Commission to increase housing-assistance payments in wealthier neighborhoods, claiming the failure to do so perpetuated segregation. Several years into the litigation, the Housing Commission voluntarily increased housing-assistance payments, and Tenants voluntarily dismissed the action. Tenants filed a motion for attorney fees, which the court granted.

On appeal, the Housing Commission argues the trial court applied the wrong legal standards and otherwise erred in concluding Tenants were the successful parties. The Housing Commission also argues that its fee motion should have been granted because Tenants' lawsuit was frivolous. We conclude the trial court did not abuse its discretion in granting Tenants' fee motion and denying the Housing Commission's. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

*The Housing Commission's Administration of the Section 8 Program*

The Housing Choice Voucher Program (Section 8 Program) is a program managed by the Department of Housing and Urban Development (HUD) that provides rent subsidies for low-income families and other disadvantaged populations. (See 42 U.S.C. § 1437f; 24 C.F.R. § 982.1.) Public housing agencies, including the Housing Commission, issue "vouchers" to eligible individuals or families and make rent subsidy payments on behalf of the voucher holders. (*Ibid.*)

Generally, the payment standard for vouchers has been "determined by a formula that considers rent prices across an entire metropolitan area."

(81 Fed.Reg. 80567 (Nov. 16, 2016).) In 2016, HUD issued a final rule requiring certain public housing agencies, including the Housing Commission, to use Small Area Fair Market Rents (SAFMR) to determine the payment standard. (See *ibid.*) Under the SAFMR rule, the Housing Commission would have been required to adopt a payment standard schedule by fair market rents for each individual zip code, rather than for the entire metropolitan area. (See *ibid.*)

However, the Housing Commission came to an agreement with HUD that allowed some flexibility in the extent to which it adopted SAFMR in its payment standard. Under this "Moving to Work" agreement, the Housing Commission adopted, and HUD approved, an alternative three-tiered payment standard called the "Choice Communities Initiative." The Housing Commission submits a Moving to Work annual plan, including its voucher payment standards, to HUD. The federal government announced it was suspending the SAFMR rule for all housing authorities before it went into effect. (See 82 Fed. Reg. 58439-01.)

In August 2017, shortly after this announcement, Tenants' counsel sent a letter to the Housing Commission urging it to incorporate SAFMR into its payment standard even though it was not required to. That letter noted that the purpose of the rule was to desegregate communities and asserted that "resegregation . . . is a crisis exacerbated in metropolitan areas, like San Diego, where vouchers are accepted only in low-opportunity, high-poverty neighborhoods, if at all." The letter noted that HUD had been "sued for its willingness to accept racial segregation in Dallas" and entered into a settlement that provided for "a small area fair market rent demonstration project." According to the letter, HUD considered the results of this pilot program as part of the "extensive research on ways to address the increasing

3

levels of segregation" that culminated in the SAFMR rule. Tenants' letter expressed "concern[ ]" that the federal government had "suspended this desegregation rule only ten days after it announced plans to use the Department of Justice to identify and target universities using affirmative action," contending that "[t]he timing of this suspension raises concerns as to the real motivations behind the current administration actions, and whether this is part of a larger strategy to further segregation." The Housing Commission's 2018 payment standards did not align with SAFMR.

In March 2018, San Diego City Council's Smart Growth & Land Use Committee held a public hearing on this issue, at which Housing Commission representatives gave a presentation. Tenants submitted a public comment "urg[ing] the City to implement Small Area Fair Market Rents to de-segregate San Diego and to ensure low-income voucher families, many of whom are people of color, find safe and stable housing in areas of opportunity." Like the August 2017 letter, the public comment noted that the SAFMR rule "was an attempt . . . to address the nation's housing segregation crisis," referring to it as a "de-segregation rule." The comment stated if it were not for the agreement with HUD, "San Diego would be required, pursuant to federal law and court order, to implement [SAFMR] as a method of housing desegregation." The comment concluded, "Delaying implementation of [SAFMR] will perpetuate patterns of metropolitan-wide racial and class segregation in our jurisdiction."

At the hearing, Tenants' counsel read much of the comment in front of Housing Commission representatives. She added that San Diego was among the metropolitan areas HUD had identified as "the most highly segregated by Section 8 vouchers." She noted that HUD had implemented the SAFMR rule after more than ten years of studying an evidence-based approach to

4

desegregation. She also explained that, although the Housing Commission's presentation to the City Council suggested SAFMR was not the best policy, that presentation was based on "inaccuracies." The Housing Commission did not align its 2019 payment standards with SAFMR.

## II.

### *This Lawsuit*

In March 2019, Tenants filed a petition for writ of mandate against the Housing Commission. The petition alleged the Housing Commission's payment standards violated the Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq.; violated the Unruh Civil Rights Act, Civil Code section 51 et seq.; constituted a breach of its contract with HUD; and constituted discrimination in state-funded programs, Government Code sections 11135 and 11139. Tenants sought declaratory and injunctive relief and a writ of mandate ordering the Housing Commission to comply with fair-housing and anti-discrimination laws.

Tenants, joined by the San Diego branch of the NAACP (NAACP), filed a first amended petition for writ of mandate adding a cause of action alleging the Housing Commission's payment standards violated the Fair Housing Act (FHA). The Housing Commission demurred to the first amended petition. The Court sustained the Housing Commission's demurrer as to the FEHA claim, the FHA claim, and the discrimination in state-funded program claim.

The plaintiffs filed a second amended petition for writ of mandate. The Housing Commission demurred again. In August 2021, the Court sustained the demurrer as to the re-pleaded breach of contract claim, the discrimination in state-funded program claim, and the request for writ of mandate. The court set a trial date for April 2022.

5

In January 2022, before trial, the Housing Commission issued new payment standards that aligned payment standards with SAFMR. "The method the San Diego Housing Commission used to set payment standards in 2022 was different than the method it used in previous years."

In April 2022, the Housing Commission filed a motion for summary judgment on the remaining claims arguing, among other things, that the claims had become moot because the new payment standards aligned with SAFMR and that the plaintiffs lacked standing. Before that motion was heard, the plaintiffs voluntarily dismissed their case.

III.

*Tenants' Motion for Attorney Fees*

The parties filed cross-motions for attorney fees and to strike or tax costs. Tenants sought fees under Code of Civil Procedure[1] section 1021.5, which authorizes a trial court to award fees to a prevailing party if the lawsuit "resulted in the enforcement of an important right affecting the public interest." Tenants argued they were the prevailing parties because, although there was not a judicial determination in their favor, the Housing Commission changed its payment standards as a result of the lawsuit.

The trial court granted Tenants' motion for attorney fees and awarded $1,050,308.45 in fees and $4,691.31 in costs. The court denied the Housing Commission's motion.

---

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure.

# DISCUSSION

## I.

### *General Principles*

"[A] court may award attorney[ ] fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if" that enforcement conferred "a significant benefit . . . on the general public or a large class of persons" and "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate." (§ 1021.5.) A plaintiff is a "successful party" whenever it obtains the relief sought in its lawsuit even if that relief is obtained "through a voluntary change in the defendant's conduct." (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 567 (*Graham*) [cleaned up].) To determine if a plaintiff is a "successful party," the court considers whether: (a) "the lawsuit was a catalyst motivating the defendants to provide the primary relief sought"; (b) "the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense"; and (c) "the plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit." (*Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608 (*Tipton-Whittingham*).)

"On appeal, our review of the trial court's decision under section 1021.5 is circumscribed." (*Ciani v. San Diego Trust & Savings Bank* (1994) 25 Cal.App.4th 563, 571 (*Ciani*).) Recognizing that "the experienced trial judge" is in the best position to assess the relevant factors, his or her "judgment will not be disturbed unless the appellate court is convinced that it is clearly wrong." (*Ibid.* [cleaned up].) Thus, "we may not disturb the ruling here 'absent a showing that the court abused its discretion . . . , i.e., the record establishes there is no reasonable basis for the [ruling].' " (*Ibid.*)

7

The Housing Commission claims the trial court did not apply the correct legal standards and, in its opening brief on appeal, urges us to review all its rulings de novo. We disagree. As we make clear next, this appeal principally presents disputes of fact and disagreement with the trial court's exercise of discretion, which we review with appropriate deference to that court's assessment.[2]

## II.

### *The Housing Commission Has Not Shown an Abuse of Discretion*

The Housing Commission claims Tenants are not entitled to fees as prevailing parties under section 1021.5, arguing: (a) they did not reasonably attempt to settle the litigation before filing the lawsuit, (b) they did not demonstrate their lawsuit was a catalyst motivating the change in payment standards; (c) they did not obtain the primary relief sought; and (d) the lawsuit lacked merit. The Housing Commission also argues that, because the lawsuit lacked merit or became meritless, its own fee motion should have been granted.

### A.     *The Prelitigation Demand Requirement*

"[A] plaintiff seeking attorney fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation." (*Graham, supra*, 34 Cal.4th at p. 577.) The authority to make this assessment falls within "the trial court['s] . . . broad discretion . . . and we can only reverse if the decision is clearly 'wrong.' " (*The Kennedy Com. v. City of Huntington Beach* (2023) 91 Cal.App.5th 436, 461 (*Kennedy*).) Even "minimal" evidence of such attempts may satisfy this standard in appropriate circumstances. (*Ibid.*)

---

[2]     At oral argument, counsel for the Housing Commission conceded review for abuse of discretion and factual findings for substantial evidence would be proper on the record before us, although counsel claimed certain issues could also be framed as legal questions.

The trial court found Tenants met this requirement. It determined that "[f]rom August 2017 through March 2019, [Tenants] made their concerns with the Section 8 payment standards known to [the Housing Commission] and participated at hearings before the City Council *on the issues*." (Italics added.) We cannot say the court's finding assessment was clearly wrong.

Before filing their lawsuit, Tenants asked the Housing Commission to align its payment standards with SAFMR and claimed the failure to do so would perpetuate racial segregation. Tenants' August 2017 letter expressly urges the adoption of SAFMR and claims the SAFMR rule was an anti-segregation tool to combat the re-segregation "crisis" in San Diego. The letter provided counsel's contact information and concluded, "Please do not hesitate to contact me . . . to discuss this issue."

Tenants' March 2018 public hearing comment is similar but more strident, concluding, "Delaying implementation of [SAFMR] will perpetuate patterns of metropolitan-wide racial and class segregation in our jurisdiction." Housing Commission representatives were given the opportunity to respond to counsel's spoken comment on behalf of Tenants.

The Housing Commission argues "[t]he trial court did not require plaintiffs to show that they personally tried to resolve the case." (Boldface & italics omitted.) But counsel's billing entries reflect that both the August 2017 letter and the March 2018 comment were on behalf of Tenants. In addition, counsel filed a declaration stating, "In the 18 month period before I filed this case, I assisted the Tenants with advocacy efforts regarding [the Housing Commission's] payment standard setting practices . . . includ[ing] . . . drafting of numerous letters and preparing verbal public comment." Counsel's declaration specifically states that her public comment

9

in March 2018 was on behalf of Tenants, and that "time had been ceded to [her] by Rafael Bautista, who leads San Diego Tenant Union."

The Housing Commission objects that counsel did not identify Tenants as her clients. However, at the March 2018 hearing, the councilmember who introduced Tenants' counsel noted counsel's speaking time had been "ceded" by Bautista.[3] We think the trial court could properly find that a reasonable person attending the March 2018 hearing would have understood that counsel was speaking on behalf of Tenants.

In any case, we are not aware of authority, and the Housing Commission presents none, that formal identification of the client is specifically required. Nor is identifying the plaintiffs necessary to further the purposes of the prelitigation demand requirement, which is to avoid "[a]warding attorney fees for litigation when those rights could have been vindicated by reasonable efforts short of litigation." (*Graham, supra,* 34 Cal.4th at p. 577.) Tenants' communications put the Housing Commission on notice of their grievances and enabled the Housing Commission to communicate with Tenants' counsel about this issue. There is no indication

_____

[3]     The Housing Commission has filed a request for judicial notice of "a screenshot of the Office of the City Clerk on 'How to Join and Participate in City Council Meetings,' (© 2022–2024)," arguing these procedures show counsel should have identified herself as speaking on behalf of Tenants. In light of the copyright notice date, it appears these procedures were not in effect at the time of the 2018 meeting and are thus not relevant to our review. In addition, it seems this document was not presented to the trial court, which is vested with the discretion to decide fee motions. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 (*Seabest*) [" '[W]hen reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' "].) The request for judicial notice is denied.

10

that in the circumstances of this case, counsel's failure to identify her clients would further the purpose of the prelitigation demand requirement.

The Housing Commission also argues "[t]he trial court improperly considered outreach that was directed to entities other than defendant." (Boldface & italics omitted.) The Housing Commission concedes, however, that the August 2017 letter was directed to the Housing Commission and addressed to its president and CEO. Although the Housing Commission claims the March 2018 public comment was directed to the City Council, representatives of the Housing Commission were present at the hearing and were directly addressed by Tenants' counsel when she gave spoken comment. Contrary to the Housing Commission's assertions, the trial court's order does not state which specific communications it relies on. We find the letter and comment discussed above to be sufficient to sustain the ruling. (*Kennedy*, *supra*, 91 Cal.App.5th at p. 461 [even "minimal" evidence of reasonable attempts to settle the matter short of litigation is sufficient in appropriate circumstances].) We do not presume the court erred. Just the opposite: "a judgment is presumed to be correct and must be upheld in the absence of an affirmative showing of error." (See *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1550.)

The Housing Commission protests that the 2017 letter did "not even address the Community Choice Initiative that is now at issue," referring to its three-tiered approach to setting payment standards. But the Housing Commission fails to explain how the Community Choice Initiative is relevant. It is undisputed that, under the Community Choice Initiative, the Housing Commission did not align payment standards with SAFMR until 2022. The pertinent aspect of the initiative was addressed by Tenants. In any event, Tenants' March 2018 public comment expressly addressed the Community

11

Choice Initiative, which was sufficient to bring the issue to the attention of the Housing Commission.

Finally, the Housing Commission contends Tenants' communications are insufficient because they did not "threaten[ ] to sue, ma[k]e a demand, or identif[y] any legal violations." (Boldface & italics omitted.) Without citation to authority, the Housing Commission claims that prelitigation notice "cannot be accomplished through generalized criticism, proposed policy changes, or political lobbying. Rather, the plaintiff's burden is more specific. It must identify a violation of law and explain the manner in which the law was violated." The Housing Commission's proposed standard is more stringent than, and thus inconsistent with, the Supreme Court's guidance.

When re-affirming the catalyst doctrine in *Graham*, the Supreme Court emphasized: "Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must *at least notify the defendant of its grievances and proposed remedies* and give the defendant the opportunity to meet its demands within a reasonable time." (*Graham, supra*, 34 Cal.4th at p. 577, italics added.) In its limited discussion of this requirement, the Supreme Court elected to emphasize its flexible nature and enumerate minimum requirements: notifying the defendant of grievances and proposed remedies and giving the defendant a reasonable opportunity to enact those remedies.

Furthermore, the Supreme Court's "starting point" for adopting "sensible limitations on the catalyst theory" was to recognize that trial courts are not " 'automatons unable to recognize extortionists,' " but are both "expected and instructed to exercise discretion." (*Graham, supra*, 34 Cal.4th at p. 575 [cleaned up].) And here, we note the trial court presided over the parties' litigation for three years, holding at least a dozen hearings. As such,

12

the court is in the best position to assess the relevant factors. (*Ciani, supra,* 25 Cal.App.4th at p. 571.) We think adding the bright-line requirements urged by the Housing Commission to this fundamentally flexible paradigm is inconsistent with the Supreme Court's guidance.

*Graham* cited *Grimsley v. Board of Supervisors* (1985) 169 Cal.App.3d 960, 966 (*Grimsley*), as apparent inspiration for the prelitigation demand requirement. (*Graham, supra,* 34 Cal.4th at p. 577.) In *Grimsley,* the plaintiff was successful insofar as the trial court declared that the county had "a duty to comply with Government Code sections 65356 and 65356.1," which "provide that any modification of a general plan shall first be 'referred to the planning commission for report and recommendation,' and that before such hearing and report the commission 'shall hold at least one hearing on the proposed change or addition.' " (*Grimsley,* at p. 966.) The court of appeal affirmed the trial court's refusal to grant attorney fees in part because the plaintiff "made no [prelitigation] complaint or suggestion to the concerned county officials about the failure to comply with Government Code sections 65356 and 65356.1, or in what respects those statutes were not followed." (*Ibid.*) The court observed, "it is a near certainty that had [plaintiff] timely pointed out to an appropriate county official or agency, the respects in which [these statutes] had not been followed, appropriate corrective action would have been promptly forthcoming." (*Ibid.*) *Grimsley* only supports that *some* prelitigation notice is required.

The short discussion in *Graham* mentions two other cases, neither of which appear to involve formal settlement discussions. In *S.D. v. Faulkner* (S.D. Ind. 1989) 705 F.Supp. 1361, 1363, the principal pre-litigation interaction was a letter from "counsel from Legal Services Organization of Indiana, Inc." "outlining concerns regarding [certain] practices and programs"

13

at a girl's reform school, including allegations "that physical discipline and beatings were being imposed, that [one treatment program] had supplanted virtually every other treatment program, that [the program] was inadequate for many girls, and that the [treatment] groups were allowed to veto a girl's parole." That opinion mentions additional "discussions and correspondence" between counsel and the eventual defendants, but it does not mention any specific legal allegations. (*Ibid.*) Similarly, *Graham* cites *Garrison v. Board of Directors* (1995) 36 Cal.App.4th 1670, and notes that California Environmental Quality Act litigants must "inform agency of objections before litigation to give agency opportunity to respond." (*Graham, supra*, 34 Cal.4th at p. 577.)

The Housing Commission's other cited authorities do not persuade us that Tenants' correspondence and public comment could not constitute reasonable efforts to settle. The Housing Commission claims "*Grimsley* is instructive." But unlike in *Grimsley*, Tenants did point out their grievance (racial segregation exacerbated by Section 8 payment standards) and proposed remedy (adopting the SAFMR rule).

Moreover, we cannot say "it is a near certainty . . . appropriate corrective action would have been promptly forthcoming" (*Grimsley, supra*, 169 Cal.App.3d at p. 966) had Tenants been more threatening or legalistic in their correspondence. The record reflects that the Housing Commission supported repealing both the SAFMR rule and a rule requiring housing authorities to affirmatively ensure fair housing. In August 2017, the CEO of the Housing Commission publicly explained that he did not think the SAFMR rule was good policy. At the March 2018 hearing, after receiving Tenants' August 2017 letter and March 2018 public hearing comment, a Housing Commission representative listed multiple concerns about the SAFMR rule in

14

defending the Housing Commission's alternative policy. Even after alleged legal violations were delineated in Tenants' complaint, the Housing Commission did not change its payment standards. Instead, the Housing Commission actively litigated this case for nearly three years before it aligned payment standards with SAFMR.[4] These are very different circumstances from *Grimsley*, where "[m]any of the matters concerning which relief was sought by [the plaintiff], were already under consideration by the [defendant], when the action was filed." (*Grimsley*, at p. 964.)

The Housing Commission also relies on *Baxter v. Salutary Sportsclubs, Inc.* (2004) 122 Cal.App.4th 941, in which there was "*no evidence* that [plaintiff] notified" defendant of its grievances—"minor imperfections in [defendant's] contracts"—prior to filing his lawsuit. (*Id.* at pp. 946–948, italics added.) There plaintiff's counsel filed a declaration stating, " 'Prior to filing a request for a preliminary injunction I contacted attorneys for defendant and requested assurances that it would discontinue using the non-complying documents with consumers.' " (*Id.* at p. 947, fn. 4.) The court found this declaration inadequate as: (1) it did not state there had been any efforts to notify plaintiff of the concerns before filing the lawsuit, only before the later-filed motion for a preliminary injunction; (2) counsel's "statement [did] not indicate the manner in which [counsel] contacted [defendant's]

---

[4] The Housing Commission points to evidence of unsuccessful settlement discussions that occurred in 2021, suggesting that the Housing Commission might also have engaged in pre-litigation settlement discussions that "could well have" avoided the need for litigation. Given this record, we do not agree that failed settlement negotiations two years into the litigation suggest that pre-litigation discussions "could well have" succeeded. To the contrary, the fact that the case did not settle even two years after the action was filed strongly suggests that even the more specific prelitigation efforts the Housing Commission now demands would have been unavailing.

attorneys"; and (3) "there is no indication that the request for 'assurances' identified the specific changes [counsel] demanded, nor is there any indication of whether there were any other conditions attached to his request (such as the payment of attorney fees)." (*Ibid.*) None of the factors relevant to the analysis in *Baxter* are present here. Tenants provided the prelitigation communications they rely on, and those communications identified the "specific changes" Tenants desired.

The Housing Commission characterizes Tenants' correspondence as fundamentally political or advocacy work that did not make a "demand" or identify a "grievance" as contemplated by *Graham*. But Tenants' August 2017 letter and March 2018 public comment were very clear as to their grievances and proposed remedy: they wanted the Housing Commission to adopt the SAFMR rule, in part to remediate racial segregation in San Diego communities. However these efforts are characterized, they were not the kinds of generalized complaints that would deprive an entity of a reasonable opportunity to redress the grievances.

Nor did Tenants merely identify a policy preference. They alleged that "[d]elaying implementation of [SAFMR] will perpetuate patterns of metropolitan-wide racial and class segregation in our jurisdiction." The Housing Commission is legally prohibited from engaging in practices that perpetuate segregation. (See *Martinez v. City of Clovis* (2023) 90 Cal.App.5th 193, 257.) And as we noted, the August 2017 letter specifically flagged that HUD had been "sued for its willingness to accept racial segregation in Dallas" and entered into a settlement that provided for "a small area fair market rent demonstration project." We cannot say the trial court abused its discretion by concluding that these communications constitute "reasonable efforts short

16

of litigation" to effectuate the desired change prior to filing a lawsuit. (*Graham, supra*, 34 Cal.4th at p. 577.)

At oral argument, the Housing Commission contended *Graham* requires a plaintiff to seek the vindication of its "legal rights" and that a trio of California Supreme Court opinions on this issue all support its position. We disagree. First, those words—"legal right[s]"—appear only in the dissent and concern the viability of the catalyst theory itself, not the majority's prelitigation demand requirement. (*Graham, supra*, 34 Cal.4th at pp. 594–595 (dis. opn. of Chin, J.).) And contrary to the Housing Commission's suggestion, we do not glean any relevant information from the Court's decision to call it a "prelitigation demand requirement" in *Vasquez v. State of California* (2008) 45 Cal.4th 243, 254, or any of the court's language in *Tipton-Whittingham, supra*, 34 Cal.4th at p. 609, a companion case to *Graham*. These cases do not individually or collectively stand for the Housing Commission's proposition.

Importantly, the record does not reflect that the Housing Commission might have changed its policy if only Tenants' prelitigation correspondence had been clearer. (Cf. *Grimsley, supra*, 169 Cal.App.3d at p. 966.) As we discussed above, the Housing Commission publicly opposed the SAFMR rule before this lawsuit was filed and vigorously litigated for years before the judge who ultimately decided the fee motion. Because the prelitigation demand requirement "is a judicially created rule to promote the purposes of section 1021.5 and deter attorneys from filing meritless suits merely to obtain attorney fees, it should not be applied to bar an attorney fees recovery where to do so would defeat the core purpose of the statute." (*Cates v. Chiang* (2013) 213 Cal.App.4th 791, 816.) The Housing Commission's proposed standard would not further the purpose of the statute and improperly

17

constrain the discretion of the trial court judge, who is in the best position to make this determination. (See *Ciani, supra*, 25 Cal.App.4th at p. 571.)

To be sure, correspondence with more explicit legal claims will often provide stronger evidence of the " 'necessity of private enforcement and the attendant financial burden.' " (*Hogar Dulce Hogar v. Community Development Com. of City of Escondido* (2007) 157 Cal.App.4th 1358, 1364.) It is not, however, mandated by the language or the logic of *Graham* and progeny.[5]

B. *Causation*

A plaintiff seeking catalyst fees must show its "lawsuit was a catalyst motivating the defendants to provide the primary relief sought." (*Tipton-Whittingham, supra*, 34 Cal.4th at p. 608.) Thus, " 'courts check to see whether the lawsuit initiated by the plaintiff was "demonstrably influential" in overturning, remedying, or prompting a change in the state of affairs challenged by the lawsuit.' " (*Artus v. Gramercy Towers Condominium Assn.* (2022) 76 Cal.App.5th 1043, 1056.)

The trial court concluded, based on the record, that Tenants' lawsuit caused the Housing Commission to change its payment standards. The court noted deposition testimony from the Housing Commission's designated "person most knowledgeable regarding the Housing Commission's decision to change its payment standards in 2022." "When asked why [the Housing

---

[5] The Housing Commission asks us to take judicial notice of documents filed by the parties in *Thomas v. Kent* (C.D.Cal., Mar. 16, 2018, No. CV 14-8013-FMO-AGR) and *Housing Works v. County of Los Angeles* (C.D.Cal., Oct. 13, 2017, No. 2:15-cv-08982-GW-RAO). We do not rely on these unpublished federal court cases, and thus filings in those cases are not relevant to our analysis. Nor were these documents presented to the trial court. (See *Seabest, supra*, 14 Cal.4th at p. 444, fn. 3.) The request for judicial notice is denied.

Commission] aligned the payment standards with SAFMR in 2022, [the deponent] responded that the Commission 'looked at numbers . . . then took a look at what the budget costs would be, and when that number was determined, then [the Commission] went ahead and aligned.' " He claimed, " '[t]here is no particular reason as to why or why not we did not use this method' " in prior years. The court noted, "when presented the chance to explain [its] decision-making process, [the Housing Commission] claim[s] to not have one and that the payment standards changed for no particular reason." Based on this response and "the chronology of events," the court drew reasonable inferences from the evidence and concluded that the change was due to Tenants' lawsuit.

The court found the Housing Commission's "evidence [did] not rebut the inference that [Tenants'] lawsuit was a substantial factor in motivating [the] change in conduct." The court noted that although a declaration from a Housing Commission representative stated that the payment standards were in part "based on HUD funding," the "evidence show[ed] that even when HUD increased funding, the increase was not reflected in the payment standards, which suggests that the amount of funding is not determinative of the allocation amount."

The Housing Commission claims the trial court considered only that the change to payment standards was made after Tenants filed their lawsuit, citing this court's warning in a recent Public Records Act case against the " '*post hoc, ergo propter hoc*' " ("[a]fter this, therefore resulting from it") fallacy. (*Valenti v. City of San Diego* (2023) 94 Cal.App.5th 218, 228 & fn. 5.) The Housing Commission argues the trial court "inverted the burden of proof" by "presum[ing] causation, and fault[ing] the Housing Commission for failing to conclusively disprove it." We do not think this is a fair

19

characterization of the trial court's analysis.  The court considered the Housing Commission's repeated failures to explain a significant change in payment standards, not its failure to adduce evidence.  For the reasons discussed below, this was a reasonable assessment of the record.

According to an analysis prepared by Tenants' expert, the payment standards for the least expensive zip codes were 85–97% of SAFMR in 2018, 85–92% in 2019, 85–90% in 2020, and 84–90% in 2021.  The payment standards for moderately expensive zip codes were 73–83% of SAFMR in 2018, 69–81% in 2019, 74–85% in 2020, and 76–87% in 2021.  The payment standards for the most expensive zip codes were 73–81% of SAFMR in 2018, 67–76% in 2019, 67–75% in 2020, and 74–82% in 2021.  In 2022, payment standards rose to 96% of SAFMR for the least expensive zip codes, 98% for moderately expensive zip codes, and 100% for the most expensive zip codes, increasing more substantially in the more expensive neighborhoods.

The Housing Commission's designated person most knowledgeable about the issue declined to identify any reason the payment standard changed so significantly in 2022, testifying as follows:

> "[Q]  One is looking and aligning with small area fair market rents and the other looking at the final funding?
>
> "A  No, that is incorrect.  There are many approaches that are used as far as setting up payment standards, but both of them are used together.  Funding is always a factor in setting our payment standards.
>
> "Q  So why in 2022 did the Housing Commission align the payment standards with Small Area Fair Market Rents?
>
> "A  We always look at the SAFMRs, so that is something which we've always done.  Our payment standards are informed by many factors, including the SAFMRs.  And this year we aligned them with two-bedroom SAFMRs.

20

"Q  Why did you do that this year?

"A  We took a look at the numbers.  We then took a look at what the budget costs would be, and when that number was determined, then we went ahead and aligned it.

"Q  Why wasn't this done in past years?

"A  In past years we've always used the SAFMR to inform the payment standards.  We simply did not use this method.

"Q  Why not?

"A  There is no particular reason as to why or why not we did not use this method."

Nor did a later declaration from a Housing Commission representative explain why the change was made or the new "method" was used.  Although she stated the Housing Commission "exercises its discretion in setting the payment standards upon a balancing of budgets and needs for the [Moving to Work] funds," she did not identify any specific factor that would account for the significant increase in funding for Section 8 vouchers in 2022.

"[T]he defendant . . . knows better than anyone why it made the decision that granted the plaintiff the relief sought, and the defendant is in the best position to either concede that the plaintiff was a catalyst or to document why the plaintiff was not."  (*Graham, supra*, 34 Cal.4th at p. 573.)  The trial court fairly inferred that the failure of the Housing Commission's chosen representatives to describe a plausible reason for the change indicated that Tenants' lawsuit was a catalyst.

C.    *Primary Relief*

To obtain fees under a catalyst theory, a party must show it obtained "the primary relief sought" in its lawsuit.  (*Tipton-Whittingham, supra*, 34 Cal.4th at p. 608.)  The Housing Commission argues that Tenants "did not

achieve the long-term policy change they sought," but rather "a single, discretionary rate adjustment." The trial court rejected this contention, concluding that, "the evaluation of funding and determination to allocate the funds in [the Housing Commission's] discretion is based on some 'method,' as [its representative] testified." The Housing Commission has not shown this constituted an abuse of discretion.

The Housing Commission argues the trial court "disregarded" the primary relief requirement. But the court both recited the correct standard and directly addressed the Housing Commission's argument. The Housing Commission also claims the trial court "disregarded" evidence that Tenants sought to obtain long-term policy change. However, the trial court evaluated the motion with the understanding that Tenants had sought a policy change and found that the Housing Commission had enacted that policy change.

Nor is the trial court's conclusion unreasonable in light of the record. As the court noted, the Housing Commission's representative acknowledged that the Commission had used a different "method" to set payment standards in 2022. At the March 2018 City Council hearing, another Housing Commission representative stated, "raising payment standards is not a one year commitment, it's a long-term commitment." He said raising payment standards is "maybe the hardest decision a housing authority has to make because you are saying, 'From here on out we are going to pay more money for our vouchers.' " The Housing Commission has thus acknowledged both that it adopted a new "method" of setting the payment standard, and that raising payment standards constituted a "long-term" commitment. While we do not consider the Housing Commission estopped from changing its position, we also note that the Housing Commission conceded in its motion for summary judgment that Tenants had attained their stated litigation

22

objectives and the "increase in payment standards destroy[ed] the justiciability of a controversy alleged in the [second amended petition] and render[ed] this action moot."

The Housing Commission contends the change in payment standards cannot reflect a change in policy because "under San Diego Municipal Code section 98.0301(d)[(8)(D)], Housing Authority action is required for 'adoption or amendment of any [Housing] Commission policy.'" While this may be true generally, Tenants cite evidence that the setting of payment standards does not need to be approved by the Housing Authority, including a City Council resolution permitting the Housing Commission to unilaterally adopt Moving to Work initiatives. The Housing Commission does not respond to any of this evidence in its reply brief.[6] We cannot conclude the trial court abused its discretion by finding Tenants obtained the primary relief sought.

D.    *Merits of the Lawsuit*

Finally, the Housing Commission argues Tenants' lawsuit lacked merit. It first claims Tenants failed to establish that the NAACP or the Tenant Union had standing to sue because they failed to "identify members of the [Tenant Union] and NAACP who were personally injured by the Housing Commission setting [Section 8] payment standards below fair market rent," to wit, members who are Section 8 voucher holders. But in the second amended petition, Tenants allege "NAACP members include . . . families or individuals who are participating in . . . [the Housing Commission's] Section 8 program." Tenants further allege, "The majority of [Tenant Union]

---

6    Tenants have filed a motion to strike portions of the Housing Commission's reply brief because, it claims, the brief misrepresents the record and raises issues for the first time. Tenants' motion is denied. We have considered the reply brief on its merits. The Housing Commission's related request for judicial notice is denied as moot.

23

members are minority families or individuals who are participating in or are wait listed for [the Housing Commission's] Section 8 program." The petition is verified by both an agent of the Tenant Union and the chapter president of the NAACP. This is competent evidence to meet Tenants' threshold burden of establishing associational standing. (See, e.g., *Safieddine v. MBC FZ, LLC* (2024) 103 Cal.App.5th 1086, 1099.)

The Housing Commission next argues the lawsuit lacked merit because the NAACP did not have capacity to sue after its "parent organization—the National Association for the Advancement of Colored People, Inc.—was suspended for failure to pay taxes with the Franchise Tax Board as of January 4, 2021." However, the NAACP was not awarded any fees, and the Housing Commission fails to show that the NAACP's presence in the case resulted in any more fees being granted to Tenants.[7]

The Housing Commission has similarly not shown that it should have recovered fees as a "prevailing defendant" because the entity parties lacked standing or capacity to sue. The NAACP and Tenant Union did not lack standing. And the Housing Commission fails to argue it incurred any additional fees due to the NAACP's continued presence in the case after it allegedly lost capacity to sue, identifying only fees incurred in connection with its unsuccessful fee motion. The Housing Commission fails to explain

---

[7] The Housing Commission claims "the parties engaged in discovery and discovery motions on issues that would have been unnecessary had only McDowell brought suit," citing pages from the trial court's register of actions. These entries do not specify the "issues" alluded to and thus do not support the Housing Commission's claim. (See, e.g., *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 716 (*Browne*) [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited].' "].) And the trial court denied catalyst fees for at least some discovery matters.

24

why such expenses are recoverable, forfeiting such arguments.  (See *Browne, supra*, 213 Cal.App.4th at p. 716.)

## DISPOSITION

The order of the trial court is affirmed.  Tenants shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


DO, J.

WE CONCUR:

DATO, Acting P. J.


KELETY, J.

25